UNITED STATES DISTRICT COURT

**JUDGE BUCHWALD**

COPY

---------------------------------- X

3RD DIMENSION, INC.,                :

       Petitioner,            :          Case No.

  -against-                             :          **07 CIV 9549**

JEREMY DeBONET and SKYWARD          :          **NOTICE OF REMOVAL**
MOBILE, LLC,

       Respondents.          :

---------------------------------- X

Respondents, Skyward Mobile, LLC (now known as Skyward Mobile, Inc.) and Jeremy

De Bonet ("Respondents"), hereby file this Notice of Removal of the above-captioned

proceeding to the United States District Court for the Southern District of New York from the

Supreme Court of the State of New York where the proceeding is now pending, captioned *3rd*

*Dimension Inc. v. Skyward Mobile, LLC and Jeremy De Bonet*, Supreme Court of the State of

New York, New York County, Index No. 603401/07, and state:

      1.     Upon information and belief, Petitioner 3rd Dimension, Inc. ("Petitioner" or "3rd

Dimension") commenced this special proceeding in the Supreme Court of the State of New

York, New York County, on October 15, 2007.  Respondents accepted service of process on

October 16, 2007.  A copy of Petitioner's Petition For Preliminary Injunction In Aid of

Arbitration, setting forth the claim for relief upon which the proceeding is based (attached hereto

as Exhibit A) was first received by Respondents after the close of business on October 15, 2007.

      2.     Petitioner seeks a preliminary injunction in aid of arbitration pursuant to N.Y.

C.P.L.R. § 7502(a), and the United States District Court for the Southern District of New York

has jurisdiction over the action pursuant to 28 U.S.C. § 1332(a) by reason of the diversity of

citizenship of the parties.

3.    The matter in dispute exceeds $75,000, exclusive of interest and costs.  According to the Petitioner's demand for arbitration (attached hereto as Exhibit B) filed with the American Arbitration Association on October 18, 2007, 3rd Dimension claims that the dollar amount of its claim is $150,000 and seeks "damages in an amount to be proved in the arbitration, but in any event, greater than $75,000." Ex. B.  Removal of a petition seeking only injunctive relief is appropriate where the possible award resulting from the desired arbitration exceeds $75,000. *See, e.g.*, *Doctor's Assocs., Inc v. Hamilton*, 150 F.3d 157, 160 (2d Cir. 1998) (holding that for purposes of the amount in controversy for arbitration, court should look through to possible arbitration award); *General Trans. Servs., Inc v. Kemper Ins. Co.*, 2003 WL 21703635, at *2 (N.D.N.Y. June 25, 2003) (looking to demand for arbitration to determine amount in controversy where underlying case involved injunctive and declarative relief prior to arbitration).

4.    Upon information and belief, at the time of the commencement of this action in state court, and since that time, Petitioner is and has been a citizen of the State of Nevada and the State of New York.  The Petition alleges that Petitioner is a Nevada corporation with its principal place of business in New York.

5.    On October 15, 2007, the date this proceeding was filed, Respondent Skyward Mobile, LLC changed its corporate structure (wholly unrelated to this action) from a limited liability company to a corporation.  Respondent Skyward Mobile, Inc. is a Delaware corporation with it principal place of business in Woburn, Massachusetts.  As a result, Respondent Skyward Mobile is a citizen of Delaware and Massachusetts.  Moreover, even if the Court were to consider the citizenship of Skyward Mobile, LLC, diversity of citizenship between the parties still exists.  Skyward Mobile, LLC was a citizen of the Commonwealth of Massachusetts.  All of the managers of Skyward Mobile, LLC (Jeremy De Bonet, Michael Wessler and Dr. Michael Bolotski) are residents of Massachusetts.  In addition, Skyward Mobile, LLC has the same principal place of business as Skyward Mobile, Inc. in Woburn, Massachusetts.

7.  Respondent Jeremy De Bonet is a resident of North Andover, Massachusetts, and therefore a citizen of Massachusetts.

9.  Jurisdiction exists in this Court where the matter in controversy is between "citizens of different states," and where the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a)(1). Accordingly, the District Court has original jurisdiction over this action.

10.  A copy of all process, pleadings and orders served upon Respondents in the state court proceeding is attached hereto as Exhibit C.

11.  Respondents will give written notice of the filing of this notice as required by 28 U.S.C. § 1446(d). A copy of this notice will be filed with the clerk of the Supreme Court of the State of New York, County of New York as required by 28 U.S.C. § 1446(d).

WHEREFORE, Respondents request that this action proceed in this Court as an action properly removed to it.

Dated: New York, New York
October 25, 2007

Respectfully submitted,

COOLEY GODWARD KRONISH LLP

By: _Scott J. Pashman_

William O'Brien (WO-5276)
Scott J. Pashman (SP-7620)
1114 Avenue of the Americas
New York, NY 10036
Phone: (212) 479-6000
Fax: (212) 479-6275

OF COUNSEL:
Robert B. Lovett
Meghan M. Hart
The Prudential Tower
800 Boylston Street
46th Floor
Boston, MA 02199
(617) 937-2300

Attorneys for Respondents
Skyward Mobile, Inc. and Jeremy De Bonet

Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

3RD DIMENSION INC.,                                                :

                                        Petitioner,               :        INDEX NO. _603401_ /07

            - against -                                            :        **PETITION FOR
                                                                            PRELIMINARY
JEREMY DeBONET and SKYWARD MOBILE,                                 :        INJUNCTION IN AID
LLC,                                                                        OF ARBITRATION**
                                                                  :
                                        Respondents.               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


        Petitioner, 3rd Dimension Inc. ("**Petitioner**" or "**3rd Dimension**"), by its attorneys, as

and for its Petition for Preliminary Injunction in Aid of Arbitration states as follows:

                                **THE PARTIES**

        1.        Petitioner 3rd Dimension is a Nevada corporation with its principal place of

business at 201 W. 52nd St., New York, New York.  3rd Dimension and its wholly owed

subsidiary, SkyMobileNet, are mobile marketing and application companies that develop and

distribute innovative live video content to consumers through mobile devices.  Petitioner's

principal product, on which its business model is based, is a proprietary live mobile traffic

application which delivers real-time traffic video to mobile device users in a unique and

entertaining manner (the "**Traffic Cam Application**").

        2.        Upon information and belief, Respondent Jeremy DeBonet ("**DeBonet**") is the

founder and president of Respondent Skyward Mobile, LLC.  (Skyward and DeBonet are

collectively referred to as "**Respondents**.")  Upon information and belief, Skyward Mobile,

LLC, is a Delaware limited liability company with its principal place of business at 130 New

Boston St., Suite 103, Woburn, Massachusetts.

## JURISDICTION AND VENUE

3.      The Court has personal jurisdiction over Respondents by virtue of N.Y. C.P.L.R. § 302(a) and pursuant to the confidentiality, non-circumvention and non-disclosure agreement between the parties, dated May 1, 2006 ("**Confidentiality Agreement**"), which forms the basis for this action and which states that "each party herein subjects itself voluntary [sic] to and shall be governed by the laws of the State of New York."

4.      Venue is proper by virtue of N.Y. C.P.L.R. § 7502(a)(i), which provides that "the proceeding shall be brought in the court and county specified in the agreement." Section 10 of the work order between the parties, dated May 1, 2006 ("**Work Order**"), states that the parties expressly agree to settle all disputes relating thereto "by binding arbitration in New York City, NY."

5.      Furthermore, even if the Work Order and Confidentiality Agreement were silent as to venue, venue would still be appropriate pursuant to N.Y. C.P.L.R. § 7502(a)(ii) because New York County is a county in which at least one of the parties resides or is doing business.

## FACTUAL BACKGROUND

### The Work Order and Confidentiality Agreement

6.      3rd Dimension has created a proprietary hardware and software platform, along with an operating infrastructure, that is used for the delivery of quality video programming. Among its applications, 3rd Dimension offers the Traffic Cam Application throughout the New York metropolitan area, and is in the process of installing and launching it in many other metropolitan areas throughout the United States.

7.      3rd Dimension has been marketing and offering for sale its Traffic Cam Application since 2006.

2

8.    On or about May 1, 2006, 3rd Dimension entered into the Work Order with Respondents to "develop and enhance" the Traffic Cam Application. (Affidavit of Bruce Laskin, sworn to on October 15, 2007 ("**Laskin Aff.**"), Exhibit A).

9.    The terms of the Work Order provide that all intellectual property, including "all inventions, systems, processes, designs, innovations and improvements (including source code)" related to the Traffic Cam Application, shall be the sole property of 3rd Dimension.

10.    The Work Order also provides that "any dispute, controversy, or claim arising out of, in connection with, or in relation to this Work Order or the breach of any of the provisions hereof shall be settled by binding arbitration in New York City, N.Y. pursuant to the rules then obtaining of the American Arbitration Association." The Work Order expressly provides that the "prevailing party shall be entitled to recover all reasonable fees and expenses of the costs of such arbitration."

11.    In addition, the parties entered into the Confidentiality Agreement which expressly obligates Respondents to "hold in confidence and not directly or indirectly reveal, report, publish, disclose or transfer any Confidential Information for any purpose." Under the terms of the Confidentiality Agreement, "Confidential Information" includes, *inter alia*, "proprietary technology . . . including all trade secrets."

12.    Further, the Confidentiality Agreement provides that given the "unique nature of the Confidential Information . . . in the event that a party fails to comply with any of its obligations under this Agreement, each party to this Agreement will suffer irreparable economic harm" which "monetary damages will be inadequate to compensate" and "the injured party will be entitled to seek immediate injunctive relief."

### 3rd Dimension's Intellectual Property

13.     3rd Dimension has invested substantial resources in the development of its proprietary technology and intellectual property, namely the Traffic Cam Application, resulting in a significant competitive advantage for 3rd Dimension in the delivery of traffic content to mobile devices.

14.     3rd Dimension also consistently expends vast amounts of time and resources to protect the confidentiality of the Traffic Cam Application, by among other things, requiring its developers and business partners to execute non-disclosure agreements and enforcing same.

15.     The Traffic Cam Application is the basis for 3rd Dimension's entire business model and is one of its most valuable proprietary assets.

### Respondents' Unlawful Conduct

16.     3rd Dimension recently became aware that Respondents have been offering for sale a traffic cam system nearly identical to 3rd Dimension's Traffic Cam Application to wireless carriers and traffic-related companies.

17.     Specifically, Respondents have submitted a proposal for the development of a traffic camera application to a company called Global Traffic Network, a leading provider of real-time traffic information in Australia and Canada (the "**Global Traffic Network Proposal**"). In the Global Traffic Network Proposal, Respondents claim they will "create a mobile application utilizing a unique graphic selection interface that lets users intuitively and efficiently choose which traffic camera or route they wish to view." Such description mirrors precisely the 3rd Dimension product. (See Laskin Aff., Exhibit C).

18.    In addition, Respondents have submitted proposals to Sprint Nextel (the "**Sprint Proposal**") (Laskin Aff., Exhibit D) and Traffic.com (the "**Traffic.com Proposal**") related to a traffic cam application, which also appears to be nearly identical to the Traffic Cam Application.

19.    Indeed, on October 10, 2007, 3rd Dimension's Chief Operating Officer, Bruce Laskin ("**Laskin**") met with a Product Manager at Sprint Nextel who is responsible for, among other things, procuring traffic-related applications for their network. Laskin introduced Sprint to 3rd Dimension's Traffic Cam Application. The Sprint Product Manager told Laskin that the Traffic Cam Application was highly similar to an application they were already planning to launch which was supplied by respondent, Skyward Mobile. (Laskin Aff., ¶ 30).

20.    Finally, Respondents have been using a demonstration program to sell their infringing traffic cam service (the "**Demonstration**"). The Demonstration not only emulates 3rd Dimension's proprietary Traffic Cam Application, but uses the actual proprietary feeds from 3rd Dimension's own operating service, representing them as their own.

21.    With unfettered access to 3rd Dimension's intellectual property and trade secrets, Respondents have brazenly disseminated and offered to sell the very propriety technology developed and enhanced under contract for 3rd Dimension. As a result, 3rd Dimension stands to lose substantial business, revenue and market position if Respondents are not enjoined from marketing and selling 3rd Dimension's proprietary technology as their own.

22.    Pursuant to the Work Order, which requires arbitration of any disputes arising under the Work Order, 3rd Dimension shall be filing a petition of arbitration with the American Arbitration Association for, among other claims, breach of the Work Order and Confidentiality Agreement and misappropriation of trade secrets.

## Irreparable Harm

23.     If Respondents are permitted to continue to abuse and misappropriate 3rd Dimension's proprietary technology and other intellectual property, 3rd Dimension's proprietary lead in its industry will be compromised, causing a devastating and immeasurable effect on 3rd Dimension's business, including lost sales, lost profits and business opportunities, loss of goodwill and damages to its reputation.

24.     In fact, 3rd Dimension already has been denied at least one potential customer as a result of Respondents' misappropriation of the Traffic Cam Application. The Sprint Product Manager told Laskin that while he was impressed by 3rd Dimension's Traffic Cam Application, Sprint may not be interested in it because it was too similar to Skyward Mobile's traffic cam application. (Laskin Aff., ¶ 30).

25.     The Sprint Nextel Product Manager then made it clear that he would not purchase the Traffic Cam Application because he had no need for two applications that are so similar.

26.     The product that respondent Skyward Mobile is marketing for purchase mirrors almost exactly the description of the Traffic Cam Application. Each product is described as a "mobile application" that, once downloaded, allows users to view images from live traffic cameras along major roads and crossings. Because these programs are identical, companies are unlikely to be able to distinguish between them. Therefore, not only will Respondents' illicit use of the Traffic Cam Application cause irreparable damage to 3rd Dimension in the form of lost business and revenue, but should Respondents' program fail to run properly, Petitioner's reputation will be severely and irreparably damaged as well.

27.     With 3rd Dimension's business and reputation on the line, there is no doubt that irreparable harm will result if Respondents' illicit conduct is not enjoined.

28.    3rd Dimension respectfully requests that the Court issue an injunction preventing Respondents' further abuse and disclosure of 3rd Dimension's valuable proprietary technology and other intellectual property during the commencement and pendency of arbitration between the parties.

29.    This week, 3rd Dimension will file with the American Arbitration Association in New York a demand for arbitration against Respondents.

30.    No previous application has been made for the relief sought herein.

## FIRST CAUSE OF ACTION
### (Preliminary Injunction in Aid of Arbitration)

31.    Petitioner repeats and realleges the allegations contained in paragraphs 1 through 30 as though fully set forth herein.

32.    Respondents agreed to the terms of the Confidentiality Agreement, which included an obligation to "hold in confidence and not directly or indirectly reveal, report, publish, disclose or transfer any Confidential Information for any purpose."

33.    Petitioner performed fully and completely under the terms of the Work Order and under the Confidentiality Agreement.

34.    Respondents' brazen, unauthorized use and attempted distribution of the Traffic Cam Application as demonstrated by the Global Traffic Network Proposal, Sprint Proposal, Traffic.com Proposal, and Demonstration prove that they have breached the Work Order and Confidentiality Agreement between the parties by disclosing 3rd Dimension's proprietary technology to various potential competitors of 3rd Dimension.

35.    As a result of said breach, 3rd Dimension stands to lose substantial business, revenue and market position.

7

36.    Unless Respondents are enjoined from offering for sale or otherwise exploiting any of 3rd Dimension's proprietary technology, including the Traffic Cam Application, and offering for sale or otherwise exploiting a live traffic video application or system during the pendency of the arbitration between the parties, any arbitral award to which 3rd Dimension may be entitled will be rendered ineffectual.

## SECOND CAUSE OF ACTION
### (Preliminary Injunction in Aid of Arbitration)

37.    Petitioner repeats and realleges the allegations contained in paragraphs 1 through 36 as though fully set forth herein.

38.    Petitioner's Traffic Cam Application confers a competitive advantage over those in similar businesses who do not know of or use it.  Petitioner has invested and continues to invest vast amounts of time and resources in developing the Traffic Cam Application and in protecting its confidentiality by, among other things, requiring its developers and business partners to execute non-disclosure agreements.

39.    Respondents' brazen, unauthorized use and attempted distribution of the Traffic Cam Application in their Global Traffic Network Proposal, Sprint Proposal, Traffic.com Proposal, and Demonstration, in violation of the Confidentiality Agreement and Work Order, prove that they have misappropriated 3rd Dimension's closely guarded trade secrets.

40.    As a result of said misappropriation, 3rd Dimension stands to lose substantial business, revenue and market position.

41.    Unless Respondents are enjoined from offering for sale or otherwise exploiting any of 3rd Dimension's proprietary technology, including the Traffic Cam Application, and offering for sale or otherwise exploiting a live traffic video application or system during the

pendency of the arbitration between the parties, any arbitral award to which 3rd Dimension may be entitled will be rendered ineffectual.

WHEREFORE, Petitioner respectfully prays for the following relief against Respondents:

42.    Enjoining Respondents from displaying, demonstrating, posting, offering for sale, or otherwise using or exploiting any of 3rd Dimension's proprietary technology, intellectual property, trade secrets, confidential information, and documents or information related to 3rd Dimension's business model, marketing plans, relationships with third parties, and market research during the pendency and determination of the arbitration proceeding between the parties;

43.    Enjoining Respondents from displaying, demonstrating, posting, offering for sale, or otherwise using or exploiting a live traffic video application or system during the pendency and determination of the arbitration proceeding between the parties; and

44.    Granting such other and further relief as the Court may deem just and proper.

Dated:    New York, New York
           October 15, 2007

                                    DLA Piper US LLP

                                    By:_____
                                        Palmina M. Fava
                                        Christine M. Jaskiewicz
                                        1251 Avenue of the Americas
                                        New York, New York 10020
                                        Tel. (212) 335-4500
                                        Fax (212) 335-4501

                                    *Attorneys for Petitioner*
                                    *3rd Dimension Inc.*

9

To:    Jeremy DeBonet
      Skyward Mobile, LLC
      130 New Boston St.
      Suite 103
      Woburn, Massachusetts.
      *Respondents*

Exhibit B

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

## COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

**MEDIATION:** *If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐
*There is no additional administrative fee for this service.*

| Name of Respondent | Name of Representative (if known) |
|---|---|
| Jeremy DeBonet and Skyward Mobile, LLC | Robert B. Lovett, Esq. |

| Address | Name of Firm (if applicable) |
|---|---|
| 130 New Boston St. | Cooley Godward Kronish LLP |

| Suite 103 | Representative's Address |
|---|---|
| | 800 Boylston St., 46th Floor |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| Woburn | MA | O18O1 | Boston | MA | O1299 |

| Phone No. | Fax No. | Phone No. | Fax No. |
|---|---|---|---|
| 617-933-9708 | 617-848-5909 | 617-937-2313 | 617-937-2400 |

| Email Address: | Email Address: |
|---|---|
| | rlovett@cooley.com |

The named claimant, a party to an arbitration agreement dated May 1, 2006 _____, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

**THE NATURE OF THE DISPUTE**
Please see the attached Demand for Expedited Arbitration.

| Dollar Amount of Claim $150,000.00 | Other Relief Sought: ☒ Attorneys Fees  ☐ Interest |
|---|---|
| | ☒ Arbitration Costs  ☐ Punitive/ Exemplary  ☒ Other Injunctive |

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $1,800.00

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
Knowledge of intellectual property and technology.

Hearing locale  New York, New York _____  (check one) ☐ Requested by Claimant  ☒ Locale provision included in the contract

| Estimated time needed for hearings overall: | Type of Business:  Claimant ___ mobile marketing company ___ |
|---|---|
| _____ hours or 3 _____ days | Respondent ___ Technology company ___ |

Is this a dispute between a business and a consumer? ☐Yes ☒ No  Does this dispute arise out of an employment relationship? ☐ Yes ☒ No
If this dispute arises out of an employment relationship, what was/is the employee's annual wage range?  Note: This question is required by California law. ☐Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one)  ☐ Atlanta, GA  ☐ Dallas, TX  ☒ East Providence, RI  ☐ Fresno, CA  ☐ International Centre, NY, with a request that it commence administration of the arbitration.  Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative)  Date: 10/17/07 | Name of Representative |
|---|---|
| *[signature]* | Palmina M. Fava |

| Name of Claimant | Name of Firm (if applicable) |
|---|---|
| 3rd Dimension Inc. | DLA Piper US LLP |

| Address (to be used in connection with this case) | Representative's Address |
|---|---|
| 201 W. 52nd St. | 1251 Avenue of the Americas |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| New York | NY | 10019- | New York | NY | 10020- |

| Phone No. | Fax No. | Phone No. | Fax No. |
|---|---|---|---|
| 212-265-7260 | | 212-335-4500 | 212-335-4501 |

| Email Address: | Email Address: |
|---|---|
| | Palmina.Fava@dlapiper.com |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA.  Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online.  AAA Customer Service can be reached at 800-778-7879

**AMERICAN ARBITRATION ASSOCIATION**

**DEMAND FOR EXPEDITED ARBITRATION
AND STATEMENT OF CLAIM**

To:  Jeremy DeBonet
AND
Skyward Mobile, LLC
130 New Boston St.
Suite 103
Woburn, Massachusetts 01801

Cc:  Robert B. Lovett, Esq.
Cooley Godward Kronish LLP
The Prudential Tower
800 Boylston St.
46th Floor
Boston, Massachusetts 02199

PLEASE TAKE NOTICE THAT 3rd Dimension Inc. ("**3rd Dimension**" or

"**Claimants**") hereby demands arbitration with Jeremy DeBonet and Skyward Mobile, LLC

("**Respondents**"), in accordance with the dispute resolution provisions in the work order

between the parties, dated May 1, 2006 ("**Work Order**"), which provision is entitled "Disputes"

and provides for arbitration in New York, New York under the rules of the American Arbitration

Association, as follows:

> Any dispute, controversy or claim arising out of, in connection with, or in relation
> to this Work Order or the breach of any of the provisions hereof shall be settled
> by binding arbitration in New York City, NY pursuant to the rules then obtaining
> of the American Arbitration Association.  Any award shall be final, binding and
> conclusive upon the parties and a judgment rendered thereon may be entered in
> any court having competent jurisdiction thereof.  The prevailing party shall be
> entitled to recover all reasonable fees and expenses of the costs of such arbitration
> (including reasonable attorneys' fees), and if no party shall be determined by the
> arbitrator(s)  to have successfully prevailed, or to be less at fault then [sic] the
> other party, then each party shall bear its own costs and expenses (including
> attorneys' fees).  The parties shall use their best efforts to settle any and all
> disputes without resort to arbitration.

A copy of the Work Order is attached below as Exhibit A.

## NAMES AND ADDRESSES OF THE PARTIES

Claimant:       3rd Dimension Inc.
                201 W. 52nd St.
                New York, New York 10019

Respondents:   Jeremy DeBonet
                AND
                Skyward Mobile, LLC
                130 New Boston St.
                Suite 103
                Woburn, Massachusetts 01801

## STATEMENT OF THE DISPUTE

3rd Dimension asserts upon knowledge as to itself and its actions and upon information and belief as to all the other allegations:

1.      3rd Dimension has created a proprietary hardware and software platform, along with an operating infrastructure, that is used for the delivery of quality video programming.  Among its applications, 3rd Dimension offers a proprietary live mobile traffic cam application ("**Traffic Cam Application**") throughout the New York metropolitan area, and is in the process of installing and launching it in many other metropolitan areas throughout the United States.

2.      On or about May 1, 2006, 3rd Dimension entered into the Work Order with Respondents to "develop and enhance" the Traffic Cam Application.

3.      The terms of the Work Order provide that all intellectual property, including "all inventions, systems, processes, designs, innovations and improvements (including source code)" related to the Traffic Cam Application, shall be the sole property of 3rd Dimension.

4.      In addition, the parties entered into a confidentiality, non-circumvention and non-disclosure Agreement ("**Confidentiality Agreement**") which expressly obligates Respondents to "hold in confidence and not directly or indirectly reveal, report, publish, disclose or transfer any

Confidential Information for any purpose." Under the terms of the Confidentiality Agreement,

"Confidential Information" includes, *inter alia*, "proprietary technology . . . including all trade

secrets." A copy of the Confidentiality Agreement is attached below as Exhibit B.

5.    Further, the Confidentiality Agreement provides that given the "unique nature of the

Confidential Information[,] . . . in the event that a party fails to comply with any of its

obligations under this Agreement, each party to this Agreement will suffer irreparable economic

harm" and "monetary damages will be inadequate to compensate."

### 3rd Dimension's Intellectual Property

6.    3rd Dimension has invested substantial resources in the development of its proprietary

technology and intellectual property, namely the Traffic Cam Application, resulting in a

significant competitive advantage for 3rd Dimension in the delivery of traffic content to mobile

devices.

7.    The Traffic Cam Application, once downloaded by the user, permits users to view the

real-time video traffic images from more than 450 live traffic cameras along major roadways and

crossings in the greater New York City metropolitan area, stretching from New Haven,

Connecticut, to southern New Jersey. Favorite camera locations can be stored under each

number key on the mobile device. Advertisements appear during the loading of each traffic

cam's image.

8.    The Traffic Cam Application consists of a content delivery platform that incorporates a

content management system and a central repository for data that can be rendered to an extensive

library of compatible mobile devices. The Traffic Cam Application platform enables the

cohesive compression, transmission, decompression and playback of information.

3

9.      In addition to the technology, 3rd Dimension has developed highly confidential business methods and marketing plans for providing the Traffic Cam Application.

10.     3rd Dimension has procured agreements with a number of state and city Departments of Transportation to provide the required Traffic Cam Application feeds.  As a result, 3rd Dimension's Traffic Cam Application is one of the only sources of traffic information that is always live, real-time, and delivered when and where it is needed.

11.     3rd Dimension's service is currently branded for distribution in the New York metropolitan area by WCBS News Radio 880 as its "Video Cellmate" and is exclusively sponsored by BMW in that market.  3rd Dimension also consistently expends vast amounts of time and resources to protect the confidentiality of the Traffic Cam Application, by among other things, requiring its developers and business partners to execute non-disclosure agreements and enforcing same.

12.     The Traffic Cam Application is the basis for 3rd Dimension's entire business model and is one of its most valuable proprietary assets.

## Respondents' Improper Conduct

13.     On or about November 10, 2006, respondent Skyward Mobile, LLC, completed its services under the Work Order.

14.     Immediately thereafter, 3rd Dimension began promoting and offering for sale the Traffic Cam Application.  3rd Dimension had no further contact with Respondents until the initiation of this arbitration and related proceedings.

15.     3rd Dimension recently became aware that Respondents have been offering for sale a traffic cam system nearly identical to 3rd Dimension's Traffic Cam Application to wireless carriers and traffic-related companies.

4

16.    Respondents had not developed or marketed a traffic cam application prior to gaining access to 3rd Dimension's proprietary technology while completing work pursuant to the Work Order. Indeed, Respondents first introduced their product within the last four months.

17.    Recently, Respondents have submitted a proposal for the development of a traffic camera application to a company called Global Traffic Network, a leading provider of real-time traffic information (the "**Global Traffic Network Proposal**"). In the Global Traffic Network Proposal, Respondents claim they will "create a mobile application utilizing a unique graphic selection interface that lets users intuitively and efficiently choose which traffic camera or route they wish to view." Such description mirrors precisely the 3rd Dimension product. The Global Traffic Network Proposal is attached as Exhibit C.

18.    In addition, Respondents have submitted proposals to Sprint Nextel (the "**Sprint Proposal**") and Traffic.com (the "**Traffic.com Proposal**") related to a traffic cam application, which also appears to be nearly identical to the Traffic Cam Application. The Sprint Proposal is attached here as Exhibit D.

19.    Finally, Respondents have been using a demonstration program to sell their infringing traffic cam service (the "**Demonstration**"). The Demonstration not only emulates 3rd Dimension's proprietary Traffic Cam Application, but uses the actual proprietary feeds from 3rd Dimension's own operating service, representing them as their own.

20.    The proprietary technology and information used by Respondents to develop and create its infringing traffic cam application, including 3rd Dimension's proprietary data feeds, was created by 3rd Dimension after years of its own expenditures, labor, and effort. Respondents knowingly misappropriated this information and technology without authorization in an attempt to profit commercially from 3rd Dimension's expenditures, labor, and effort. In doing so,

5

Respondents were able to offer for sale a completed traffic cam application within months, whereas 3rd Dimension spent years developing the concept, technology and documentation that forms the basis of the Traffic Cam Application.

21.    Having taken advantage of unfettered access to 3rd Dimension's intellectual property and trade secrets, Respondents have brazenly disseminated and offered to sell the very proprietary technology developed and enhanced under contract for 3rd Dimension.  As a result, 3rd Dimension stands to lose substantial business, revenue and market position if Respondents are not enjoined from marketing and selling 3rd Dimension's proprietary technology as their own.

22.    If Respondents are permitted to continue to abuse and misappropriate 3rd Dimension's proprietary technology and other intellectual property, 3rd Dimension's proprietary lead in its industry will be compromised, causing a devastating and immeasurable effect on 3rd Dimension's business, including lost sales, lost profits and business opportunities.

23.    Indeed, 3rd Dimension has already begun suffering such damage.  On October 10, 2007, 3rd Dimension's Chief Operating Officer, Bruce Laskin ("**Laskin**") met with a Product Manager at Sprint Nextel who is responsible for, among other things, procuring traffic-related applications for their network.  Laskin introduced Sprint to 3rd Dimension's Traffic Cam Application.  The Sprint Product Manager told Laskin that the Traffic Cam Application was highly similar to an application they were already planning to launch which was supplied by respondent, Skyward Mobile.

24.    The Sprint Nextel Product Manager then made it clear that he would not purchase the Traffic Cam Application because he had no need for two applications that are so similar.

25.    The product that respondent Skyward Mobile is marketing for purchase mirrors almost exactly the description of the Traffic Cam Application.  Each product is described as a "mobile

6

application" that, once downloaded, allows users to view images from live traffic cameras along major roads and crossings. Because these programs are identical, companies are unlikely to be able to distinguish between them. Therefore, not only will Respondents' illicit use of the Traffic Cam Application cause irreparable damage to 3rd Dimension in the form of lost business and revenue, but should Respondents' program fail to run properly, Claimant's reputation will be severely and irreparably damaged as well.

### The Temporary Restraining Order

26.    On October 15, 2007, Claimant filed papers in New York Supreme Court, New York County, seeking a temporary restraining order ("TRO") and preliminary injunction against Respondents during the commencement and pendency of the arbitration requested herein.

27.    On October 16, 2007, Justice Herman Cahn granted a TRO which prevents Respondents from "displaying, demonstrating, posting, offering for sale, or otherwise using or exploiting any of 3rd Dimension's proprietary technology, intellectual property, trade secrets, [and] confidential information" until the preliminary injunction motion is heard.

28.    Justice Cahn set the preliminary injunction hearing on this matter for Thursday, October 17, 2007, at 2:00 p.m. The injunction is requested pending the arbitration of this matter, and the Court expressed to all parties an interest in having the arbitration proceed expeditiously.

29.    Given the sensitivity of the technology at issue, as well as its importance to 3rd Dimension's business, resolving this dispute expeditiously is critical to preventing further irreparable harm to 3rd Dimension.

### Causes of Action and Relief Sought

30.    For all the reasons explained above and in the presentations 3rd Dimension will make in the arbitration, Claimant is entitled to relief on the following grounds:

a) Respondents have breached the Work Order and Confidentiality Agreement;

b) Respondents have misappropriated confidential proprietary information and trade secrets belonging to 3rd Dimension;

c) Respondents have tortiously interfered with 3rd Dimension's potential business opportunities; and

d) Respondents are liable for unjust enrichment.

31. 3rd Dimension is entitled to all appropriate relief, including without limitation:

a) expedited arbitration for all claims set forth herein;

b) damages in an amount to be proved in the arbitration, but in any event, greater than $75,000;

c) injunctive and equitable relief, including but not limited to injunctions (i) preventing Respondents from displaying, demonstrating, posting, offering for sale, or otherwise using or exploiting any of 3rd Dimension's proprietary technology, intellectual property, trade secrets, confidential information, and documents or information related to 3rd Dimension's business model, marketing plans, relationships with third parties, and market research; (ii) preventing Respondents from displaying, demonstrating, posting, offering for sale, or otherwise using or exploiting a live traffic video application or system; and (iii) requiring that Respondents return to Claimant or destroy all intellectual property and/or proprietary information belonging to 3rd Dimension, including all documentation, marketing materials, software or technology based on the Traffic Cam Application and represent that all of 3rd Dimension's intellectual property and proprietary information has been returned to 3rd Dimension or destroyed and that no copies have been retained by Respondents or any third party;

d)    an accounting of all proceeds or other monies derived from the exploitation of 3rd Dimension's intellectual property, including the Traffic Cam Application; and

e)    attorneys' fees and costs for this proceeding, as provided in section 10 of the Work Order.

## <u>OBLIGATION TO RESPOND TO ARBITRATION NOTICE</u>

Respondents have an obligation to respond to this Notice of Arbitration in accordance with the provisions of the Commercial Rules of the American Arbitration Association.  All communications concerning this matter should be directed to:

> Palmina M. Fava
> DLA Piper US LLP
> 1251 Avenue of the Americas
> New York, New York 10020

DLA Piper US LLP

By: _____
    Palmina M. Fava
    Christine M. Jaskiewicz
1251 Avenue of the Americas
New York, New York 10020
Tel. (212) 335-4500
Fax (212) 335-4501

# EXHIBIT A

# WORK ORDER

This Work Order sets forth certain Services (as hereinafter defined) to be performed by Skyward Mobile, LLC ("DEVELOPER") in accordance with the terms and conditions herein between 3rd Dimension, Inc., its subsidiary SkyMobileNet, Inc., its subsidiaries and affiliates ("SMN") and DEVELOPER.

I.    **Services:**

Subject to the satisfaction of SMN's obligations hereunder, DEVELOPER shall provide the following services to SMN (the "Services").

Upon execution of this Work Order, DEVELOPER shall develop and enhance SMN's Mobile Traffic application to meet requirements mutually agreed to by SMN and DEVELOPER, attached hereto as Exhibit B, Demo and Project 1A. If any term or statement of this Agreement conflicts with a term or statement in Exhibit B, this Agreement will be deemed to prevail.

DEVELOPER will provide all necessary technical support, training and related documentation to SMN to provide for SMN's use of the Software ("Support") for the duration of the development and for 12 months thereafter.

DEVELOPER shall install a single instance of demonstration, test and production software, at SMNs' request.

In addition, Developer agrees to provide the following services, provided, however, that the DEVELOPER shall not be required to perform the services listed in sections 13a and 15a (as indicated by *), unless and until the DEVELOPER and SMN have mutually agreed upon the scope of such services and the compensation to be paid to the DEVELOPER:

1) Work as specified in Exhibit B, Demo and Project 1A
2) Detailed statement of work
3) Detailed manpower estimates
4) Detailed timeline/milestones
5) Scheduled 2x/week status meeting/internal demonstration
6) Detailed hardware and 3rd party software requirements
7) SQA process description
8) All operational software installed and running on our servers
9) Application installation and operation documentation
10) All source code
11) Server configuration documentation/notes
12) Rights/ownership of all source, IP, look-and-feel, etc.
13) Agreement to debug/maintain (no improvements) the Software for 12 months
*13a) Agreement to re-skin the Software.
14) Confidentiality, Non-Circumvention and Non-Disclosure Agreement (Exhibit A)
15) Agreement to assign any patent filings
*15a) Agreement to assist in authoring any patent filings
16) Analysis document specifying number of simultaneous users supported per server and how the application scales across multiple servers for additional capacity and redundancy.
17) Initial deployment on redundant array of production servers plus separate development/test server (non-redundant).

{17197\77106\A0111412.1}

2.    **Location:**
Any customization of any SMN application software and procedures shall be performed at DEVELOPER's location. It is expected that technical support and training shall be provided primarily via written documentation and phone support as specified herein. If on-site support is required, SMN will cover related transportation and lodging costs for DEVELOPER personnel.

3.    **Commencement Date:**
The Services shall commence upon the effective date of the Agreement as set forth below and DEVELOPER'S receipt of the inception payment set forth below ("Effective Date").

4.    **Term:**
This Work Order expires upon the completion of the provision of the Services .

5.    **Compensation.**
Payment by SMN to DEVELOPER for the Services shall be as follows:
(supersedes payment terms in Exhibit B)

Demo: (total: $50,000)
    Inception (50%): $25,000 - Already Paid
    Demonstration at CTIA 2006 (20%): $10,000 - Already Paid
    Development Completion (10%): $5,000 - Already Paid
    Final Payment (20%): $10,000 - Upon Execution of this Agreement and related exhibits

Project 1A: (total: $148,250)
    Inception: $15,000 - Upon Execution of this Agreement and related exhibits
    Specification: $22,500 - Upon Execution of this Agreement and related exhibits
    Internal Demonstration: $27,500 - Upon Execution of this Agreement and related exhibits
      (note: It is understood by all parties to this agreement that this is a prepayment for a work element not yet performed as an accommodation to DEVELOPER. It is expected that such work element will be completed and presented in a timely manner.)
    Development Completion: $37,500 - When final versions of all software are made available and ready for deployment
    Commercial Readiness: $34,750 - When all WORK ORDER-related systems are online and ready for customer access
    Successful Public Beta Release: $11,000 - When 100 users have been successfully activated on the deployed system, or 30 days following Commercial Readiness, whichever comes first.

SMN shall reimburse DEVELOPER for all reasonable and necessary expenses, approved in advance, in writing, incurred or paid by DEVELOPER in connection with, or related to, the performance of its Services under this Work Order (the "Expenses") within thirty (30) days after receipt thereof.

6.    **Termination:**

{17197\77106\A0111412.1}                                    2

(a)    This Work Order may be terminated at anytime as the result of a mutual agreement between DEVELOPER and SMN.

(b)    This Work Order may be terminated by either SMN or DEVELOPER upon a breach by the other party, following a 30 day cure period (from the date of written notice specifying in detail the nature of the breach).

In the event of any such termination, DEVELOPER shall be entitled to payment by SMN for: (a) that portion of the Services earned by DEVELOPER as a result of the Services performed by DEVELOPER up to the effective date of termination, and (b) the expenses incurred by DEVELOPER prior to the effective date of termination, and shall be entitled to terminate all ongoing services.

7.    **Independent Contractor Status:**
Nothing herein contained shall be construed so as to constitute SMN and DEVELOPER as joint venturers, partners or affiliates, or as to make either party liable for the obligations or debts of the other. DEVELOPER is and shall be deemed for all purposes an independent contractor, and not an employee, servant or agent of SMN. Neither party shall have any authority to bind the other party by any act, omission, representation, agreement or otherwise.

8.    **Intellectual Property:**
All inventions, systems, processes, designs, innovations and improvements (including any source code) directly related to the Services provided by DEVELOPER (collectively, the "IP"), which are made, conceived, reduced to practice, created, written, designed or developed by DEVELOPER, solely in connection with the performance of the Services shall be the sole property of SMN; provided, however, DEVELOPER shall have an irrevocable, non-transferable license for the use of the IP relating to the product created by this Work Order in non-competing businesses with respect to SMN, as pre-approved in writing by SMN. Notwithstanding the foregoing, the source code shall not be delivered to the SMN until and unless DEVELOPER has received the compensation for its Services, in full.

9.    **Non-solicitation:**
SMN and DEVELOPER hereto acknowledge that the training and qualifications of the employees and consultants of SMN and DEVELOPER are unique and that the loss of these employees and/or consultants may affect SMN's and DEVELOPER's competitiveness and continued commercial success. It is expressly agreed and understood therefore that during the term of this Agreement and for a period of one (1) year following the termination thereof, SMN and DEVELOPER will not, directly or indirectly, by themselves or as a partner or in any relationship with any other person or entity, recruit from each other, or hire, any of each other's employees or consultants or induce, solicit, or influence any employee or consultant of SMN or DEVELOPER to terminate or curtail his or her employment or engagement with SMN or DEVELOPER, without the current employer's prior written consent. The covenants and obligations of SMN and DEVELOPER set forth in this Paragraph shall be specifically enforceable in addition to and not in limitation of any other legal or equitable remedies, including monetary damages, which SMN and DEVELOPER may have.

10.    **Disputes:**
Any dispute, controversy or claim arising out of, in connection with, or in relation to this Work Order or the breach of any of the provisions hereof shall be settled by binding arbitration in New York City, NY pursuant to the rules then obtaining of the American Arbitration Association. Any award shall be final, binding and conclusive upon the parties and a judgment rendered thereon may be entered in any court having competent jurisdiction thereof. The prevailing party shall be entitled to recover all reasonable fees and expenses of the costs of such arbitration (including reasonable attorneys' fees), and if no party shall be determined by the arbitrator(s) to have successfully prevailed, or to be less at fault then the other party, then each party shall

{{71797\77106\A0111412.1}}                    3

bear its own costs and expenses (including attorneys' fees). The parties shall use their best efforts to settle any and all disputes without resort to arbitration and litigation.

11.    **Notices:**
All notices required or permitted under this Work Order shall be in writing and shall be deemed effective upon personal delivery or upon deposit in the United States Post Office, by registered or certified mail, postage prepaid, addressed to the other party at the address shown above, or at such other address or addresses as either party shall designate to the other in accordance with this provision.

12.    **Limitation of Liability; Indemnification.**

(a)    DEVELOPER's liability hereunder for damages, regardless of the form of action, shall not exceed the total amount paid to DEVELOPER for its Services pursuant to this Agreement. This shall be SMN's sole and exclusive remedy, both at law and in equity. IN NO EVENT SHALL DEVELOPER BE LIABLE FOR ANY LOST PROFITS, LOST REVENUE, LOSS OF USE, LOSS OF DATA, ALTERATION OF DATA, DELAY IN DELIVERY, PERFORMANCE OF SERVICES OR FOR ANY SPECIAL, INDIRECT, OR CONSEQUENTIAL DAMAGES, ARISING OUT OF THIS AGREEMENT, OR THE PERFORMANCE OR BREACH THEREOF, EVEN IF DEVELOPER HAS BEEN ADVISED OF THE POTENTIAL FOR SUCH DAMAGES.

(b)    SMN and DEVELOPER each hereby agree to indemnify and hold harmless the other party and the other party's officers, directors, shareholders, employees, servants and agents from and against any and all claims, liabilities and expenses of any nature whatsoever, with respect to any claims of any nature (i) arising from or caused in whole or in part by any negligent act or omission, negligent performance of services or willful misconduct of SMN or DEVELOPER or either party's employees, agents and contractors; (ii) arising from or in connection with any warranty, representation or statement made by SMN or DEVELOPER or either party's employees, agents, and contractors or (iii) arising from or in connection with the breach of any obligation of, or warranty by, SMN or DEVELOPER as set forth in this Agreement. In respect of any of the foregoing, SMN and DEVELOPER shall indemnify all of the foregoing indemnities from and against any and all costs, expenses (including reasonable attorney's fees) and liabilities incurred in connection with any claim, action or proceeding brought thereon. All indemnity obligations under this Agreement shall apply to claims arising both before and after the termination of this Agreement.

(c)    The provisions of this Section shall be in full force and effect forever and shall survive the termination of the Agreement, regardless of the manner of or reason for termination.

(d)    **TO THE EXTENT ALLOWED BY LAW, DEVELOPER HEREBY DISCLAIMS ALL WARRANTIES, BOTH EXPRESS AND IMPLIED, INCLUDING IMPLIED WARRANTIES RESPECTING MERCHANTABILITY, TITLE, AND FITNESS FOR A PARTICULAR PURPOSE. SMN ACKNOWLEDGES THAT NO REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS AGREEMENT HAVE BEEN MADE RESPECTING THE SERVICES TO BE PROVIDED HEREUNDER, AND THAT SMN HAS NOT RELIED ON ANY REPRESENTATION NOT EXPRESSLY SET OUT IN THIS AGREEMENT.**

13.    **Miscellaneous:**
(i) This Agreement shall be binding upon and inure to the benefit of the respective parties and their successors, assigns, heirs, and personal representatives; (ii) this Agreement shall be governed by and construed in accordance with the laws of the State of New York; (iii) no waiver of any right hereunder by any party shall operate as a waiver of any other right, or of the same right with respect to any subsequent

{17197\77106\A01111412.1}                          4

10/14/2007  08:09   16037721578          P.A. GRILLO ASSOC              PAGE  09
Sent By: Matrix General LLC   (NY-USA);   7752550801;         May-1-08 12:01PM;       Page 5/9

occasion for its exercise, or of any right to damages, and no waiver by any party of any breach of this Agreement shall be held to constitute a waiver of any other breach or a continuation of the same breach; (iv) all remedies provided by this Agreement shall be in addition to all other remedies provided by law; (v) this Agreement may not be amended except in a writing signed by the parties hereto; and (vi) in no event shall DEVELOPER or SMN be liable for any delay or failure to perform any obligation or its services described hereunder due to causes beyond its control and without its fault or negligence.

{17197\7710GVA0111412.1}

5

**Skyward Mobile, LLC**

_____
Signature

_Jeremy deBonet_
Printed or Typed Name

_CEO_
Title

_5/1/06_
Date

**SkyMobilnet, Inc.**

_____
Signature

_P. Grillo_
Printed or Typed Name

_CEO_
Title

_5-1-06_
Date

**3ʳᵈ Dimension, Inc.**

_____
Signature

_P. Grillo_
Printed or Typed Name

_CEO_
Title

_5-1-06_
Date

{17197\77106\A0111412.1}

6

# EXHIBIT B

## EXHIBIT A

### CONFIDENTIALITY, NON-CIRCUMVENTION
### AND NON-DISCLOSURE AGREEMENT

THIS AGREEMENT, made and entered into by and between the following parties whose signatures and seals appear below: 3rd Dimension, Inc., a Nevada Corporation, 201 W 52nd St, New York, NY 10019, USA, and its subsidiary SkyMobileNet, Inc. hereinafter referred to as the "COMPANY", and Skyward Mobile, LLC hereinafter referred to as the "RECEIVER", by and for the consideration of the mutual covenants, promises, benefits, and terms of this contract, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, do hereby covenant and agree as follows, to wit:

WHEREAS, the parties to this Agreement, wish to share and disclose Confidential Information (as defined below) in the course of exploratory conferences, negotiations, development and deployment activities; and

WHEREAS, the parties to this Agreement mutually desire that these conferences, negotiations, development and deployment activities be as frank and open as possible;

THEREFORE, the procedures described in this Agreement are considered necessary and appropriate to achieve this purpose, and the parties hereby mutually confirm their respective understanding and agreement as follows:

1. For the purpose of this Agreement, "Confidential Information" shall mean information or material proprietary to any of the parties or designated in writing as Confidential Information by any party to this Agreement or to which any party to this Agreement may obtain knowledge or access through or as result of discussions or relationships of any of the parties to this Agreement.

2. Confidential Information includes, but is not limited to, the following types of information and other information of a similar nature (whether or not reduced to writing): financial or credit data documentation, prospects, appraisals, customer/client names or their agents or representatives, contracts or negotiations, financial sources and/or financial information , all copyrighted material, all trademarks or service marks, whether patented or not, and all technical and scientific information, test results and data as it relates to the Company and proprietary technology which the Company shall disclose to Receiver whether patented or not, including all trade secrets, any and all patents and patents pending including but not limited to, current information used in any patent applications and any other information of a similar nature (whether or not reduced to writing). Confidential Information also includes any information described above which any party to this Agreement shall have obtained from another (third) party which any of the parties to this Agreement, respectively, treat as proprietary or designate as Confidential Information. Confidential Information does not include any information which is already known to the Receiver at the time it is disclosed to the Receiver by the Company or which before being divulged by the Company (a) has become generally known to the public through no wrongful act of Receiver; (b) has been approved for release to the general public by written authorization of the Company; or (c) has been disclosed pursuant to a requirement of a government agency or law without similar restrictions or other protections against disclosure or is required to be disclosed by operation of law.

3. The parties to this Agreement mutually agree not to reproduce in any manner any Confidential Information nor use the Confidential Information to contact or solicit those individuals or the agents or representatives thereof who may be included in the Confidential Information in an effort to gain benefit through circumvention of the other party or parties to this Agreement; further the

parties to this Agreement mutually agree not to do anything that may be construed as disparaging in any way, or utilizing the Confidential Information of another party to this Agreement without first having obtained prior written consent from the party or parties so affected.

4. The parties to this Agreement mutually agree to hold in confidence and not directly or indirectly reveal, report, publish, disclose or transfer any Confidential Information to any person or entity other than a key senior employee or other party or parties who have absolute need to know such Confidential Information consistent with the respective party's obligations under this Agreement. The parties to this Agreement understand and agree that they will not utilize any of the Confidential Information for any purpose at any time other than contemplated by this Agreement.

5. Because of the unique nature of the Confidential Information, each party to this Agreement understands and agrees that the other parties to this Agreement will suffer irreparable economic harm in the event that a party fails to comply with any of its obligations under this Agreement. Accordingly, any dispute involving circumvention, breach of confidentiality or unauthorized disclosure under the terms of this Agreement, each party herein subjects itself voluntary to and shall be governed by the laws of the State of New York. In the event of any legal action by either party under this Agreement, damages to be paid by the losing party shall include all court costs, attorneys fees, travel, lodging and any other charges deemed reasonable by the court. Additionally, the parties to this Agreement understand and agree that in addition to the severe economic harm in the event of failure or breach under the terms of this Agreement, the injured party may suffer irreparable harm that monetary damages will be inadequate to compensate, and that in addition to the above mentioned remedies available at law or in equity, the injured party will be entitled to seek immediate injunctive relief to enforce the terms and conditions of this Agreement.

6. The parties to this Agreement agree that the terms and conditions of this Contract are fully applicable and binding upon themselves, all employees, their affiliates, subsidiaries, representatives, agents associates, assigns, trustees, their heirs and/or assigns, legal representatives or executors, and irrevocably bind themselves not to deal directly or indirectly with any persons, trusts, businesses, corporations or partnerships, or other entities introduced to the parties of this Agreement for purposes of or related to applications developed under contract between the parties without the knowledge and express written consent of the other parties to this Agreement. The parties hereto agree not to circumvent the other parties in any manner for a period of five (5) years from the date of this Agreement or any other contractual agreement between Themselves and any party to this Agreement.

7. The parties hereto further bind themselves, their employees, shareholders, officers, directors, associates, partners, agents or representatives to keep absolutely confidential any and all matters pertaining to this Agreement and all related and/or resulting contracts and information provided between the parties hereto.

8. The parties hereto confirm that the warranties in this Agreement are expressly intended to cover acts of negligence and any inadvertent or unintentional disclosure or violation of the terms herein.

9. This Agreement is binding and inures to the benefit of the parties hereto the owner of the patented, patent pending or proprietary technology disclosed by the Company to the Receiver, their principals, affiliates, attorneys, subsidiaries, agents, legal representatives, heirs and/or assigns.

10. This Agreement may not be modified or amended except in writing and signed by all the parties hereto.

11. This Agreement is effective on the date when signed by all parties and is executed in multiple originals, each of which has the force and effect of an original.

12. If any party to this Contract is a corporation, trust, partnership, or association, the individual or individuals signing this Agreement on behalf of said party's behalf expressly warrant:

    (a) That each such person has the full and complete authority, in writing, of the Receiver's Board of Directors, Board of Trustees, General Manager or Managing Partner, Managing Director or Directors to legally and effectively bind that party to this Agreement;

    (b) That said Directors, Trustees, General Manager or Managing Partner, Managing Director or Directors have been fully informed concerning the terms and conditions of this Agreement and acknowledge and understand and have approved the provisions of this Agreement; and

    (c) That the party is, in fact and at law, effectively bound by the provisions of this Agreement. This signatory of or for all parties hereby certifies that he or they are entering into this Agreement of his or her or its own free will, respectively.

NOW, WHEREFORE, this Agreement is executed in multiple original copies by and on behalf of the parties testifying that the foregoing instrument fully sets forth their entire agreement and understanding, whose seals and signatures are affixed with the year and date set forth below.

3ᴿᴰ Dimension, Inc.

Signature

P. Grillo
Print Name

Skyward Mobile, LLC

Signature

CEO                    5/1/06
Print Name

SkyMobileNet, Inc.

Signature

P. Grillo
Print Name

# EXHIBIT C



# Proposal for Development of Traffic Camera Application

## For



Skyward Mobile
130 New Boston Street
Suite 103
Woburn, MA 01801
www.skywardmobile.com
Tim Kilroy
(617) 899-2436
tim@skywardmobile.com

CONFIDENTIAL

## Overview

Global Traffic Network, the leading provider of real time
traffic information in Australia and Canada, wishes to
create a flexible, dynamic mobile application that will
allow subscribers the ability to see real time images from
traffic cameras placed strategically at key traffic centers
in Australia, Canada and going forward, the UK and EU.

Skyward Mobile will create a mobile application utilizing a
unique graphic selection interface that lets users
intuitively and efficiently choose which traffic camera or
route they wish to view.

## Why Skyward Mobile?

Skyward Mobile is a leading provider of next generation
mobile applications. With deep experience creating rich and
complex media applications, Skyward Mobile is uniquely
qualified to drive the development of a wide market
reaching consumer application.

The mobile application development market is a complex and
fragmented place. With dozens of carriers, thousands of
handsets, and no true device standard or application
protocols, the development of a mobile application is truly
the recreation of the application again and again and
again. Skyward Mobile has changed the development and
economics of application development through the creation
of the patent pending **Apx Platform.**

This "write-once, run anywhere" platform absolutely changes
not only the development dynamics, allowing a single
application to perform as well as possible across the
widest array of mobile devices possible, but it also
changes the economics of development.  Typically, the
development cycle includes the writing of an application,
with extensive QA testing for a subset of phones.  Then,
the application is rewritten for another subset of phones.
This process is repeated again and again.  Then, when the
platform changes, say from J2ME to Palm, the application
needs to not only be re- written, but also rather re-
architected for the new platform.  Then the individual
handset porting process must begin again.  And the process
continues across multiple platforms. The economic reality
of this process is that the work in developing an
application for a platform, and then porting it to several
phones is approximately the same.  Each instance of porting
can have nearly the same impact on dollars and time as the



original development.  Efficiencies in development never
arise, and the development costs never diminish.  These
stark realities determine the success of a mobile
application.

Simply, if it costs too much in dollars or time to port an
application to a new platform, or to a less popular phone,
the development will not be done, because there is no
opportunity to recoup the cost of the effort or create a
positive ROI.  Skyward Mobile changes these dynamics and
preserves the "long tail" of application distribution and
revenue generation.  This expansion of the market size can
create dramatic revenue opportunities.  In a subscription
example, a $2.99 monthly subscription opportunity targeted
at Palm Treos might have a total market size of 1,000,000.
However, if that same subscription opportunity were offered
to the entire J2ME base in the United States, the market
size might be 50-70 times the
size. While it may seem like a simple task of "porting" the
Palm application to J2ME, the J2ME US market is comprised
of approximately 500 different handsets across nearly a
dozen carriers.  Potentially, this could mean a port cycle
upwards of 5000 different versions of the original
application. And these applications would be static, never
changing according to unique conditions.  This would take
tens of thousands of developer hours, and potentially
millions in additional development costs.  And regardless
of the market size, this opportunity may never be fully
capitalized because of the scale and scope of the effort.
An undertaking of this magnitude could force a company to
allocate all of its development at this single project and
compromise product innovation efforts. The Skyward Mobile
Apx solution allows for single development, with multiple
marketplace opportunities that have been heretofore lost
because the cost of development exceeded the possible
return for a particular marketplace.  Apx gives brand
owners, content owners and application owners the chance to
create high-quality applications that can grow as the
market changes, and continue to delight users across
networks, across platforms and across continents.


## Definitions

**Volume Apx License**: Typically, the Apx platform is
licensed in a one license/one application way.
However, some partners may wish to create many

CONFIDENTIAL

applications. In order to provide the most cost
effective customer solution, Skyward Mobile can offer
volume licensing to select partners. This volume
license carries with it the opportunity to have
multiple applications developed on the **Apx** platform
for a reduced licensing fee. The development of a new
application triggers a licensing event. Each license
event covered by the volume license is good for 12
months from the final delivery of the specific
application from Skyward to the customer.

**Application Development Fee:** This fee is the fee paid
by the Global Traffic Network to Skyward Mobile for
the design, programming, and production of an
application.

**Regional Application Development Fee:** This is a fee
paid by the Global Traffic Network to Skyward Mobile
for the re-skinning of the basic application covered
by the **Application Development Fee** to make subsequent
versions appropriate to the region in which they will
be deployed. For instance, if Global Traffic Network
were to create a camera network that covered London,
this fee would cover the creation of a London specific
application. These subsequent applications will be
developed within 60 days of request. If this timeline
request predates the integration of Phase 2
functionality, that functionality will be added when
added to the initial launch applications.

**Traffic Camera Integration Fee:** This is a monthly fee
paid by the Global Traffic Network to Skyward to
insure the ongoing inclusion of that camera to the
appropriate application.

**Hosting and Operations Fee:** This is a monthly fee paid
by Global Traffic Network to Skyward Mobile for the
24/7/365 monitoring and hosting of the applications
developed and deployed. This fee is based on the
number of applications distributed. This fee also
covers 24/7/365 support for Global Traffic Network,
and 24/7/365 application support for GTN customers.

**Distribution Fee:** This is a per-event fee paid by
Global Traffic Network to Skyward Mobile for the
distribution of the developed applications

CONFIDENTIAL

**Map Image Licensing Fee:** This is a pass through cost from Skyward Mobile to Global Traffic Network for the monies needed to secure appropriate map images for inclusion in the application for user navigation.

CONFIDENTIAL

## The Proposal

Skyward Mobile will create a multi-platform
application
that exhibits
similar
functionality to the images below. Essentially, for a
given area, the end user will be able to pick
successively more focused areas, eventually resulting
in a particular traffic camera. The figures below
represent the essential functionality.

CONFIDENTIAL



This is a custom application that will be developed on
the Skyward **Apx** platform. This application is not
derivative of any other application currently deployed
by Skyward, and is a unique application.


**Deliverables**
    The Application



Skyward will develop an application that at
rollout supports 80 handset models of Global
Traffic Network's choosing. Currently supported
platforms include Java, Symbian, BREW, RIM, Palm
and Windows Mobile. Additional handset support
will be developed over time at no additional cost
to Global Traffic Network.

The functional specification of this application
is as follows:

- **Phase 1**
  - The application will provide a visual
    interface consisting of a sequence of
    roadmap views to allow the user to select
    a traffic camera feed.
  - The first map view will allow the user to
    select from one of several subdivisions.
  - The subdivisions will appear as different
    highlighted regions of the map as the user
    navigates through the choices.
  - Once selected, the view will change to a
    zoomed map of that subdivision from which
    the user may select another subdivision.
  - This process will continue until the user
    is able to select from a set of cameras on
    the map.
  - The approximate perspective of each camera
    will be highlighted on the map as the user
    navigates through the options.
  - Upon selecting a camera, the application
    will display an image or video from that
    camera if available.
  - Static images may be played in a series to
    simulate a video feed from the camera.
  - The user will be able to configure up to
    10 of the camera views as presets to be
    accessed via the 10 numeric keys of the
    phone with one touch.


- **Phase 2**
  - This will include the integration of
    location-based services for appropriate
    carriers. Not all carriers offer LBS, nor
    do all handsets support LBS. The following

CONFIDENTIAL

functionality will be available, minimally on Telstra and Telus handsets that support LBS

- o Users shall be able to select from a subset of cameras based upon the current location.
- o Users will be able to listen to an audio feed of traffic information specific to the current metropolitan area.
- o Optionally, users may select which audio feed to listen to in the application.

**The Support**

Skyward Mobile will provide 24/7/365 hosting and monitoring of this application. Further, Skyward will engage hosting facilities that are geographically advantageous to GTN in order to reduce latency issues. Further, Skyward will offer 24/7 application support to GTN customers via a third party call center.

**Customer Obligations**

Global Traffic Network will provide appropriate XML feeds, the specifications of which will be developed by Skyward Mobile, that provide locations of cameras and intersections. Further, Global Traffic Network will be responsible for the cost of any and all fees associated with the licensing of map images for use in the applications.

Global Traffic Network is responsible for any travel and expenses incurred by Skyward Mobile for setup and ongoing operation of this service.

**Fees and Deliverables**

Skyward Mobile will develop a traffic camera viewing application that supports 180 handsets of GTN's choice. The initial development will create 4 discrete applications, covering Eastern Canada, Western Canada, Eastern Australia and Western Australia. Additional applications covering other areas will require additional **Apx** licenses and regional development fees. The application functionality in Phase 1 will be developed within 90


CONFIDENTIAL

days of engagement, and Phase 2 will be developed within 60 days of the deployment of the Phase 1 application.

Volume Apx License:

| Number of Applications | Cost Per Apx License (Year 1) | Cost Per Apx License (Year 2 and forward) |
|---|---|---|
| 1-4 | $100,000.00 USD | $75,000.00 USD |
| 5-10 | $80,000.00 USD | $60,000.00 USD |
| 11-20 | $60,000.00 USD | $50,000.00 USD |
| 21+ | $50,000.00 USD | $35,000.00 USD |

**Phase 1 Application Development Fee:**
$200,000.00 USD
(E & W Canada, E&W Australia)
**Phase 2 Application Development Fee:**
$100,000.00 USD
**Regional Application Development Fee:**
**(Per Application)**
$50,000.00 USD
**Traffic Camera Integration Fee (Monthly):**
(Minimum 2500 Cameras)          $4.00 USD per camera

**Hosting and Operation Fee (Monthly)**
(Minimum 10,000 Users)          $0.50 USD per User

**Distribution Fee: SMS and app provisioning**

$0.10 USD per distribution

**Map Image Licensing Fee:**          At Cost

**Fee Schedule:**
    **Due at Engagement:**
    Apx Licensing fee, apps 1-4:
    $600,000.00 USD

    **Due at Phase 1 Delivery**

CONFIDENTIAL

Phase 1 Development Fee:
$600,000.00 USD
50% Deposit Phase 2 Development Fee:
$150,000.00 USD

**Due at Phase 2 Delivery**
50% Final Payment Phase 2 Development Fee:
$150,000.00 USD

**In the event of Regional Application Development:**
    **Due at Request**
    Apx Licensing Fee:
                                    As indicated above

    **Due at Delivery**
    Regional Application Development Fee:
    $50,000.00

    **Post Deployment**
    Distribution Fee                      Monthly
    Hosting                             Monthly
    Map Image Licensing Fees
    As Invoiced

## Terms

The terms outlined in this proposal will be honored until May 1, 2007.

This letter serves as a written understanding between Skyward Mobile and Global Traffic Network.  It outlines the nature of this partnership, expectations for each organization, and a timeline for accomplishing these expectations. The term of this agreement is 24 months, with automatic annual renewals unless either party terminates this agreement with 30 days notice before an anniversary date.

Upon execution of this agreement, both parties may elect to agree to an additional contract which may add additional detail to the legal rights and responsibilities of each party as outlined here.



Both parties agree to keep the terms of this agreement confidential.

This understanding may not be assigned or transferred to another party without the written consent of the other.
**SKYWARD MOBILE**                                **GLOBAL TRAFFIC NETWORK**

_____                    _____

JEREMY DE BONET, CEO

CONFIDENTIAL