# EXHIBIT D



TRAFFIC.COM



**Product Description:** 30 of the top cities comprehensive traffic news, updated live, every 5 minutes. We will be adding a location aware component to the application for the Sprint launch. The product will show the metro traffic Jamcast video for the appropriate "favorite" market, or the market as determined through GPS. If location aware, a selection a major roadways within a 10 mile radius will be shown, as well as incident reports for those roads in that radius.

**Target Market:** The target market for this product is any of the 100 million commuters in the 30 target markets.

> Albany, Atlanta, Austin, Baltimore, Boston, Chicago, Cincinnati, Dallas, Detroit, Houston, Indianapolis, Las Vegas, Los Angeles, Miami, Milwaukee, Minneapolis, New York City, Orlando, Philadelphia, Phoenix, Pittsburgh, Sacramento, San Diego, San Francisco, St. Louis, Seattle, Tampa, Washington D.C.

**Partners:** Skyward and Traffic.com are currently under contract for this project.

**Handset Support:** This will work on all current Vision and Power Vision devices; further, location support will be added to support all Sprint Devices

**Sales Model:** We suggest a $4.99-$5.99 MRC for access to the Traffic.com Jamcast product.





**Marketing Plan:** Skyward and Traffic.com will cooperatively market this product through the Traffic.com WAP site and through WAP advertisements on the Sprint ad network. Further, Traffic.com will put this in rotation in the advertisements.

**Commercially Ready:** September

CONFIDENTIAL

Exhibit C

*mot seq #*

At ____*l. A.*____ Part *49* of the
Supreme Court of the State of New
York, at the Courthouse, 60 Centre
Street, New York, New York, on the
__*16*__ day of October, 2007

```
                                              x
3RD DIMENSION INC.,                           :    INDEX NO. *603401* /07
                                              :
                          Petitioner,         :    ORDER TO SHOW CAUSE
                                              :
          - against -                         :
                                              :
JEREMY DeBONET and SKYWARD                    :
MOBILE, LLC,                                  :
                                              :
                          Respondents.        :
                                              x
```

Upon reading and filing of the annexed Petition for Preliminary Injunction in Aid of

Arbitration, Affirmation of Urgency of Palmina M. Fava, Esq., dated October 15, 2007, the

Affidavit of Bruce Laskin, sworn to on October 15, 2007, and the accompanying Memorandum

of Law in Support of Petitioner's Motion for a Temporary Restraining Order and Preliminary

Injunction in Aid of Arbitration, and sufficient cause appearing therefor, it is

ORDERED that respondents Jeremy DeBonet and Skyward Mobile, LLC (collectively

"Respondents"), show cause before this Court, to be held at the County Courthouse located at

60 Centre Street, New York, New York, on the *18* day of *October*, 2007, at *2:00* a.m., or

as soon thereafter as counsel can be heard, why an order should not be made pursuant to N.Y.

C.P.L.R. § 7502(c) and/or 6301 *et seq.*, granting the following relief:

  1.    Pending the hearing and determination of this motion, Respondents and their

officers, agents, employees or anyone else acting on their behalf are

        a.    enjoined from displaying, demonstrating, posting, offering for sale, or

              otherwise using or exploiting any of 3rd Dimension's proprietary

              technology, intellectual property, trade secrets, confidential information,

~~and documents or information related to 3rd Dimension's business model,~~

~~marketing plans, relationships with third parties, and market research;~~

~~b.    enjoined from displaying, demonstrating, posting, offering for sale, or~~

~~otherwise using or exploiting a live traffic video application or system~~ *and it is*
*further*

*Ordered*    During the pendency ~~and determination~~ of the arbitration proceeding,

Respondents and their officers, agents, employees or anyone else acting on their behalf are

    a.    enjoined from displaying, demonstrating, posting, offering for sale, or

    otherwise using or exploiting any of 3rd Dimension's proprietary

    technology, intellectual property, trade secrets, confidential information,

    and documents or information related to 3rd Dimension's business model,

    marketing plans, relationships with third parties, and market research;

    b.    enjoined from displaying, demonstrating, posting, offering for sale, or

    otherwise using or exploiting a live traffic video application or system.

    3.    Petitioner shall be entitled to such other and further relief as this Court may deem

just and proper.

    **SUFFICIENT** cause being alleged, let service of a copy of this Order to Show Cause,

together with the papers upon which it is granted, on Respondents by overnight delivery on or

before October _16_, 2007, be deemed good and sufficient service thereof. *and it is*

*Oral Argument*
*Directed* _____ *AC*
            *JSC*

ENTER:

    Dated:    New York, New York
           October ___, 2007

J.S.C.

- 2 -

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

3RD DIMENSION INC.,                             :

                  Petitioner,                    :          INDEX NO. _____ /07

     - against -                                :          **PETITION FOR
                                                                       PRELIMINARY
JEREMY DeBONET and SKYWARD MOBILE,             :          INJUNCTION IN AID
LLC,                                           :          <u>OF ARBITRATION</u>**
                                               :
                Respondents.                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Petitioner, 3rd Dimension Inc. ("**Petitioner**" or "**3rd Dimension**"), by its attorneys, as and for its Petition for Preliminary Injunction in Aid of Arbitration states as follows:

## THE PARTIES

1.     Petitioner 3rd Dimension is a Nevada corporation with its principal place of business at 201 W. 52nd St., New York, New York. 3rd Dimension and its wholly owed subsidiary, SkyMobileNet, are mobile marketing and application companies that develop and distribute innovative live video content to consumers through mobile devices. Petitioner's principal product, on which its business model is based, is a proprietary live mobile traffic application which delivers real-time traffic video to mobile device users in a unique and entertaining manner (the "**Traffic Cam Application**").

2.     Upon information and belief, Respondent Jeremy DeBonet ("**DeBonet**") is the founder and president of Respondent Skyward Mobile, LLC. (Skyward and DeBonet are collectively referred to as "**Respondents**.") Upon information and belief, Skyward Mobile, LLC, is a Delaware limited liability company with its principal place of business at 130 New Boston St., Suite 103, Woburn, Massachusetts.

## JURISDICTION AND VENUE

3.      The Court has personal jurisdiction over Respondents by virtue of N.Y. C.P.L.R. § 302(a) and pursuant to the confidentiality, non-circumvention and non-disclosure agreement between the parties, dated May 1, 2006 ("**Confidentiality Agreement**"), which forms the basis for this action and which states that "each party herein subjects itself voluntary [sic] to and shall be governed by the laws of the State of New York."

4.      Venue is proper by virtue of N.Y. C.P.L.R. § 7502(a)(i), which provides that "the proceeding shall be brought in the court and county specified in the agreement." Section 10 of the work order between the parties, dated May 1, 2006 ("**Work Order**"), states that the parties expressly agree to settle all disputes relating thereto "by binding arbitration in New York City, NY."

5.      Furthermore, even if the Work Order and Confidentiality Agreement were silent as to venue, venue would still be appropriate pursuant to N.Y. C.P.L.R. § 7502(a)(ii) because New York County is a county in which at least one of the parties resides or is doing business.

## FACTUAL BACKGROUND

### The Work Order and Confidentiality Agreement

6.      3rd Dimension has created a proprietary hardware and software platform, along with an operating infrastructure, that is used for the delivery of quality video programming. Among its applications, 3rd Dimension offers the Traffic Cam Application throughout the New York metropolitan area, and is in the process of installing and launching it in many other metropolitan areas throughout the United States.

7.      3rd Dimension has been marketing and offering for sale its Traffic Cam Application since 2006.

2

8.      On or about May 1, 2006, 3rd Dimension entered into the Work Order with Respondents to "develop and enhance" the Traffic Cam Application. (Affidavit of Bruce Laskin, sworn to on October 15, 2007 ("**Laskin Aff.**"), Exhibit A).

9.      The terms of the Work Order provide that all intellectual property, including "all inventions, systems, processes, designs, innovations and improvements (including source code)" related to the Traffic Cam Application, shall be the sole property of 3rd Dimension.

10.      The Work Order also provides that "any dispute, controversy, or claim arising out of, in connection with, or in relation to this Work Order or the breach of any of the provisions hereof shall be settled by binding arbitration in New York City, N.Y. pursuant to the rules then obtaining of the American Arbitration Association." The Work Order expressly provides that the "prevailing party shall be entitled to recover all reasonable fees and expenses of the costs of such arbitration."

11.      In addition, the parties entered into the Confidentiality Agreement which expressly obligates Respondents to "hold in confidence and not directly or indirectly reveal, report, publish, disclose or transfer any Confidential Information for any purpose." Under the terms of the Confidentiality Agreement, "Confidential Information" includes, *inter alia*, "proprietary technology . . . including all trade secrets."

12.      Further, the Confidentiality Agreement provides that given the "unique nature of the Confidential Information . . . in the event that a party fails to comply with any of its obligations under this Agreement, each party to this Agreement will suffer irreparable economic harm" which "monetary damages will be inadequate to compensate" and "the injured party will be entitled to seek immediate injunctive relief."

### 3rd Dimension's Intellectual Property

13.    3rd Dimension has invested substantial resources in the development of its proprietary technology and intellectual property, namely the Traffic Cam Application, resulting in a significant competitive advantage for 3rd Dimension in the delivery of traffic content to mobile devices.

14.    3rd Dimension also consistently expends vast amounts of time and resources to protect the confidentiality of the Traffic Cam Application, by among other things, requiring its developers and business partners to execute non-disclosure agreements and enforcing same.

15.    The Traffic Cam Application is the basis for 3rd Dimension's entire business model and is one of its most valuable proprietary assets.

### Respondents' Unlawful Conduct

16.    3rd Dimension recently became aware that Respondents have been offering for sale a traffic cam system nearly identical to 3rd Dimension's Traffic Cam Application to wireless carriers and traffic-related companies.

17.    Specifically, Respondents have submitted a proposal for the development of a traffic camera application to a company called Global Traffic Network, a leading provider of real-time traffic information in Australia and Canada (the "**Global Traffic Network Proposal**"). In the Global Traffic Network Proposal, Respondents claim they will "create a mobile application utilizing a unique graphic selection interface that lets users intuitively and efficiently choose which traffic camera or route they wish to view." Such description mirrors precisely the 3rd Dimension product. (See Laskin Aff., Exhibit C).

18.     In addition, Respondents have submitted proposals to Sprint Nextel (the "**Sprint Proposal**") (Laskin Aff., Exhibit D) and Traffic.com (the "**Traffic.com Proposal**") related to a traffic cam application, which also appears to be nearly identical to the Traffic Cam Application.

19.     Indeed, on October 10, 2007, 3rd Dimension's Chief Operating Officer, Bruce Laskin ("**Laskin**") met with a Product Manager at Sprint Nextel who is responsible for, among other things, procuring traffic-related applications for their network. Laskin introduced Sprint to 3rd Dimension's Traffic Cam Application. The Sprint Product Manager told Laskin that the Traffic Cam Application was highly similar to an application they were already planning to launch which was supplied by respondent, Skyward Mobile. (Laskin Aff., ¶ 30).

20.     Finally, Respondents have been using a demonstration program to sell their infringing traffic cam service (the "**Demonstration**"). The Demonstration not only emulates 3rd Dimension's proprietary Traffic Cam Application, but uses the actual proprietary feeds from 3rd Dimension's own operating service, representing them as their own.

21.     With unfettered access to 3rd Dimension's intellectual property and trade secrets, Respondents have brazenly disseminated and offered to sell the very propriety technology developed and enhanced under contract for 3rd Dimension. As a result, 3rd Dimension stands to lose substantial business, revenue and market position if Respondents are not enjoined from marketing and selling 3rd Dimension's proprietary technology as their own.

22.     Pursuant to the Work Order, which requires arbitration of any disputes arising under the Work Order, 3rd Dimension shall be filing a petition of arbitration with the American Arbitration Association for, among other claims, breach of the Work Order and Confidentiality Agreement and misappropriation of trade secrets.

## Irreparable Harm

23.    If Respondents are permitted to continue to abuse and misappropriate 3rd Dimension's proprietary technology and other intellectual property, 3rd Dimension's proprietary lead in its industry will be compromised, causing a devastating and immeasurable effect on 3rd Dimension's business, including lost sales, lost profits and business opportunities, loss of goodwill and damages to its reputation.

24.    In fact, 3rd Dimension already has been denied at least one potential customer as a result of Respondents' misappropriation of the Traffic Cam Application. The Sprint Product Manager told Laskin that while he was impressed by 3rd Dimension's Traffic Cam Application, Sprint may not be interested in it because it was too similar to Skyward Mobile's traffic cam application. (Laskin Aff., ¶ 30).

25.    The Sprint Nextel Product Manager then made it clear that he would not purchase the Traffic Cam Application because he had no need for two applications that are so similar.

26.    The product that respondent Skyward Mobile is marketing for purchase mirrors almost exactly the description of the Traffic Cam Application. Each product is described as a "mobile application" that, once downloaded, allows users to view images from live traffic cameras along major roads and crossings. Because these programs are identical, companies are unlikely to be able to distinguish between them. Therefore, not only will Respondents' illicit use of the Traffic Cam Application cause irreparable damage to 3rd Dimension in the form of lost business and revenue, but should Respondents' program fail to run properly, Petitioner's reputation will be severely and irreparably damaged as well.

27.    With 3rd Dimension's business and reputation on the line, there is no doubt that irreparable harm will result if Respondents' illicit conduct is not enjoined.

28.    3rd Dimension respectfully requests that the Court issue an injunction preventing Respondents' further abuse and disclosure of 3rd Dimension's valuable proprietary technology and other intellectual property during the commencement and pendency of arbitration between the parties.

29.    This week, 3rd Dimension will file with the American Arbitration Association in New York a demand for arbitration against Respondents.

30.    No previous application has been made for the relief sought herein.

## FIRST CAUSE OF ACTION
### (Preliminary Injunction in Aid of Arbitration)

31.    Petitioner repeats and realleges the allegations contained in paragraphs 1 through 30 as though fully set forth herein.

32.    Respondents agreed to the terms of the Confidentiality Agreement, which included an obligation to "hold in confidence and not directly or indirectly reveal, report, publish, disclose or transfer any Confidential Information for any purpose."

33.    Petitioner performed fully and completely under the terms of the Work Order and under the Confidentiality Agreement.

34.    Respondents' brazen, unauthorized use and attempted distribution of the Traffic Cam Application as demonstrated by the Global Traffic Network Proposal, Sprint Proposal, Traffic.com Proposal, and Demonstration prove that they have breached the Work Order and Confidentiality Agreement between the parties by disclosing 3rd Dimension's proprietary technology to various potential competitors of 3rd Dimension.

35.    As a result of said breach, 3rd Dimension stands to lose substantial business, revenue and market position.

7

36.     Unless Respondents are enjoined from offering for sale or otherwise exploiting any of 3rd Dimension's proprietary technology, including the Traffic Cam Application, and offering for sale or otherwise exploiting a live traffic video application or system during the pendency of the arbitration between the parties, any arbitral award to which 3rd Dimension may be entitled will be rendered ineffectual.

**SECOND CAUSE OF ACTION**
**(Preliminary Injunction in Aid of Arbitration)**

37.     Petitioner repeats and realleges the allegations contained in paragraphs 1 through 36 as though fully set forth herein.

38.     Petitioner's Traffic Cam Application confers a competitive advantage over those in similar businesses who do not know of or use it.  Petitioner has invested and continues to invest vast amounts of time and resources in developing the Traffic Cam Application and in protecting its confidentiality by, among other things, requiring its developers and business partners to execute non-disclosure agreements.

39.     Respondents' brazen, unauthorized use and attempted distribution of the Traffic Cam Application in their Global Traffic Network Proposal, Sprint Proposal, Traffic.com Proposal, and Demonstration, in violation of the Confidentiality Agreement and Work Order, prove that they have misappropriated 3rd Dimension's closely guarded trade secrets.

40.     As a result of said misappropriation, 3rd Dimension stands to lose substantial business, revenue and market position.

41.     Unless Respondents are enjoined from offering for sale or otherwise exploiting any of 3rd Dimension's proprietary technology, including the Traffic Cam Application, and offering for sale or otherwise exploiting a live traffic video application or system during the

pendency of the arbitration between the parties, any arbitral award to which 3rd Dimension may be entitled will be rendered ineffectual.

WHEREFORE, Petitioner respectfully prays for the following relief against Respondents:

42.    Enjoining Respondents from displaying, demonstrating, posting, offering for sale, or otherwise using or exploiting any of 3rd Dimension's proprietary technology, intellectual property, trade secrets, confidential information, and documents or information related to 3rd Dimension's business model, marketing plans, relationships with third parties, and market research during the pendency and determination of the arbitration proceeding between the parties;

43.    Enjoining Respondents from displaying, demonstrating, posting, offering for sale, or otherwise using or exploiting a live traffic video application or system during the pendency and determination of the arbitration proceeding between the parties; and

44.    Granting such other and further relief as the Court may deem just and proper.

Dated:    New York, New York
          October 15, 2007

                              DLA Piper US LLP

                              By: _____
                                  Palmina M. Fava
                                  Christine M. Jaskiewicz
                                  1251 Avenue of the Americas
                                  New York, New York 10020
                                  Tel. (212) 335-4500
                                  Fax (212) 335-4501

                              *Attorneys for Petitioner*
                              *3rd Dimension Inc.*

9

To:    Jeremy DeBonet
       Skyward Mobile, LLC
       130 New Boston St.
       Suite 103
       Woburn, Massachusetts.
       *Respondents*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------x
3RD DIMENSION INC.,                       :
                           Petitioner,    :     INDEX NO. _____ /07
                                          :
        - against -                       :
                                          :
JEREMY DeBONET and SKYWARD                :
MOBILE, LLC,                              :
                                          :
                           Respondents.   :
------------------------------------------------x

STATE OF NEW YORK   )
                    ) ss.:
COUNTY OF NEW YORK  )

      Palmina M. Fava, being duly sworn, deposes and says:

      1.    I am an attorney duly admitted to practice before the courts of this State and am a member of the law firm of DLA Piper US LLP, attorneys for the petitioner, 3rd Dimension Inc., ("**Petitioner**" or "**3rd Dimension**"). I submit this affidavit of urgency in support of Petitioner's application, pursuant to N.Y. C.P.L.R. § 7502(c) and/or § 6301 *et seq.*, for an order temporarily restraining respondents Skyward Mobile, LLC, and Jeremy DeBonet (collectively, "**Respondents**") in aid of arbitration and pending a hearing on Petitioner's application for a preliminary injunction. I base this affidavit on documents and materials that I have reviewed and discussions that I and my colleagues have had with Petitioner's Chief Operating Officer, Mr. Bruce Laskin.

      2.    Petitioner seeks this relief on an urgent basis and in aid of arbitration because any award the Petitioner may be entitled to in the arbitration proceeding would be rendered ineffectual without a temporary restraining order. In addition, Petitioner will suffer irreparable harm if a temporary restraining order is not issued immediately.

      3.    Respondents were hired to help develop and enhance 3rd Dimension's technology. By necessity, to complete their work, Respondents had access to 3rd Dimension's

most confidential and proprietary intellectual property, including, among other things, source code for 3rd Dimension's proprietary live mobile traffic cam application.

4.    To protect its intellectual property rights and safeguard the confidentiality of the material, Petitioner insisted that Respondents enter into a work order ("**Work Order**") and confidentiality, non-circumvention and non-disclosure Agreement ("**Confidentiality Agreement**") that made clear that all intellectual property related to the Traffic Cam Application belonged exclusively to Petitioner (Affidavit of Bruce Laskin, sworn to on October 15, 2007 ("**Laskin Aff.**"), Exhibit A, ¶ 8), expressly prohibited Respondents' use or disclosure of Petitioner's intellectual property (Laskin Aff., Exhibit B, ¶¶ 3-4),  and emphasized that the material provided to Respondents contained confidential and proprietary data whose use by Respondents would irreparably harm Petitioner.  (Laskin Aff., Exhibit B, ¶ 5).

5.    Petitioner has recently learned that Respondents have brazenly been misappropriating 3rd Dimension's proprietary technology and offering to sell it to parties in direct competition with 3rd Dimension in clear violation of the Work Order and Confidentiality Agreement between the parties.

6.    If the Court does not grant the requested relief, Petitioner's intellectual property, trade secrets, and confidential information relating to its proprietary live mobile traffic cam application will fall into the hands of industry competitors and potential competitors.  Without the requested temporary restraining order, Petitioner will suffer lost sales, lost profits, lost business opportunities, loss of goodwill and damage to reputation which cannot be quantified.

7.    The facts of this dispute are set forth in greater detail in the Laskin Aff. and in the annexed Petition for Preliminary Injunction in Aid of Arbitration.

8.    Petitioner respectfully asks this Court to grant its application for a temporary restraining order because, absent such protection, any award to which the Petitioner may be entitled in the arbitration proceeding would be rendered ineffectual, the irreparable harm that Petitioner will suffer cannot be rectified monetarily, and Petitioner is likely to succeed on the merits given Respondents' actions.

9.    Respondents will suffer *no* harm or inequity by being enjoined from displaying, demonstrating, posting, offering for sale, or otherwise using or exploiting Petitioner's proprietary live mobile traffic cam application.  Respondents do not own the proprietary technology and do not have Petitioner's permission to use or otherwise exploit such proprietary technology and related intellectual property and confidential information.

10.    I made a good faith effort to notify Respondents of the time, date and place that this application would be made by placing a telephone call to Respondents earlier today.

11.    No previous application has been made to this court for the relief requested herein.

12.    The signature page from the Affidavit of Bruce Laskin is a true and correct copy of such signature page.  The original signature pages will be furnished to the Court once received by mail.

13.    I make these statements under penalty of perjury and they are true to the best of my knowledge.

WHEREFORE, Petitioner respectfully requests, pursuant to N.Y. C.P.L.R. § 7502(c) and/or 6301 *et seq.*, that the Court issue a temporary restraining order, as prayed for herein.

Dated:  New York, New York
          October 15, 2007

Palmina M. Fava

- 3 -

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------x

3RD DIMENSION INC.,                              :

                     Petitioner,         :    INDEX NO.|_____/07

        - against -                             :

JEREMY DeBONET and SKYWARD           :
MOBILE, LLC,                                     :

                  Respondents.       :

----------------------------------------------x

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK  )

      Bruce Laskin, being duly sworn, deposes and says:

      1.      I am the Chief Operating Officer ("**COO**") of 3rd Dimension Inc. ("**3rd**

**Dimension**" or "**Petitioner**"), where I have been continuously employed since January, 2005.

As COO, I am responsible for all operations of 3rd Dimension, including 3rd Dimension's

proprietary hardware and software platforms.

      2.      Prior to joining 3rd Dimension, I was involved in the development of wireless

messaging gateway technology and led teams responsible for some of today's most widely used

cellular data and mobile Internet applications.

      3.      I submit this affidavit in support of 3rd Dimension's motion for a temporary

restraining order ("**TRO**") in the above-referenced litigation.  I have personal knowledge of the

facts and circumstances set forth herein, and would testify accordingly if called to do so.

      4.      3rd Dimension seeks a TRO to protect its invaluable proprietary technology and

other intellectual property and trade secrets, upon which its entire business is based.  Absent the

TRO, the potential harm to 3rd Dimension's business will be devastating and will not be compensable monetarily.

## BACKGROUND

5.      3rd Dimension and its wholly owed subsidiary, SkyMobileNet, are mobile marketing and application companies that develop and distribute innovative live video content to consumers through mobile devices.

6.      3rd Dimension has created a proprietary hardware and software platform, along with an operating infrastructure, that is used for the delivery of live video programming to cellular telephones.

7.      Among its applications, 3rd Dimension offers a proprietary live mobile traffic cam application ("**Traffic Cam Application**") which delivers real-time traffic video to mobile device users in a unique and entertaining manner.  The Traffic Cam Application has been offered by 3rd Dimension since November 2006, is currently offered throughout the New York metropolitan area, and is in the process of being installed and launched in many other metropolitan areas throughout the United States.

8.      Once downloaded to a mobile device, the Traffic Cam Application permits users to choose from more than 450 live traffic cameras along major roadways and crossings in the greater New York City metropolitan area, stretching from New Haven, Connecticut, to southern New Jersey.  Users can navigate the real-time video traffic images in their selected locations. Favorite camera locations can be stored under each number key on the mobile device. Advertisements appear during the loading of each traffic cam's image.

9.      The Traffic Cam Application consists of a content delivery platform that incorporates a content management system and a central repository for data that can be rendered

to an extensive library of compatible mobile devices.  The Traffic Cam Application platform enables the cohesive compression, transmission, decompression and playback of information.

10.     In addition, 3rd Dimension has developed highly confidential business methods and marketing plans for providing the Traffic Cam Application.

11.     3rd Dimension has agreements in place with a number of state and city Departments of Transportation to provide the required Traffic Cam Application feeds.  As a result, 3rd Dimension's Traffic Cam Application is one of the only sources of traffic information that is always live, real-time, and delivered when and where it is needed.

12.     The Traffic Cam Application assists drivers in planning their routes more carefully to avoid traffic, save fuel, and thereby, benefit the environment.

13.     3rd Dimension's service is currently branded for distribution in the New York metropolitan area by WCBS News Radio 880 as its "Video Cellmate" and is exclusively sponsored by BMW in that market.

## 3RD DIMENSIONS' WORK WITH RESPONDENTS

14.     3rd Dimension entered into a work order (the **"Work Order"**) with respondent Skyward Mobile, LLC (**"Skyward"**), effective May 1, 2006, for the development and enhancement of 3rd Dimension's Traffic Cam Application.  Respondent Jeremy DeBonet (**"DeBonet"**) was at that time, and still is today, founder and president of Skyward Mobile, LLC. (Skyward and DeBonet are collectively referred to as **"Respondents."**)

15.     Under the Work Order, Respondents provided services related to the development of 3rd Dimension's proprietary technology and Traffic Cam Application as an independent contractor.

16.     Section 8 of the Work Order expressly provides that all intellectual property, including "all inventions, systems, processes, designs, innovations and improvements (including source code)" developed by Respondents under the Work Order shall be the sole property of 3rd Dimension.  A true and correct copy of the Work Order is attached hereto as Exhibit A.

17.     The Work Order also provides that "any dispute, controversy, or claim arising out of, in connection with, or in relation to this Work Order or the breach of any of the provisions hereof shall be settled by binding arbitration in New York City, N.Y. pursuant to the rules then obtaining of the American Arbitration Association."  The Work Order expressly provides that the "prevailing party shall be entitled to recover all reasonable fees and expenses of the costs of such arbitration."

18.     3rd Dimension and Respondents also entered into a Confidentiality, Non-Circumvention and Non-Disclosure Agreement ("**Confidentiality Agreement**") effective May 1, 2006.  In the Confidentiality Agreement, Respondents promised to "hold in confidence and not directly or indirectly reveal, report, publish, disclose, or transfer any Confidential Information," and that they "will not utilize any of the Confidential Information for any purpose at any time other than contemplated by this Agreement."  A true and correct copy of the Confidentiality Agreement is attached hereto as Exhibit B.

19.     In the Confidentiality Agreement, Skyward Mobile admits that because of the "unique nature of the Confidential Information," in the event a party fails to comply with any of its obligations under the Agreement, the other party to the Agreement "will suffer irreparable economic harm" as well as "irreparable harm that monetary damages will be inadequate to compensate . . . and the injured party will be entitled to seek immediate injunctive relief to enforce the terms and conditions of this Agreement."

- 4 -

20.     As an independent contractor hired to help develop and enhance the Traffic Cam Application, Respondents had access to 3rd Dimension's most confidential and proprietary intellectual property, including source code for the Traffic Cam Application, and proprietary trade secrets, including information concerning its business model, marketing plans, relationships with third parties, and market research.

21.     3rd Dimension has invested substantial resources in the development of its proprietary technology and intellectual property, resulting in a significant competitive advantage for 3rd Dimension in the delivery of traffic content to mobile devices.

22.     3rd Dimension also consistently expends vast amounts of time and resources to protect the confidentiality of the Traffic Cam Application, by among other things, requiring its developers and business partners to execute non-disclosure agreements.

23.     The Traffic Cam Application is the basis for 3rd Dimension's entire business model and is one of its most valuable proprietary assets.

### RESPONDENTS' UNLAWFUL CONDUCT

24.     On or about November 10, 2006, Respondents completed their services under the Work Order resulting in its termination.

25.     3rd Dimension has learned that Respondents have been demonstrating and selling 3rd Dimension's development expertise and intellectual property to companies engaged in, or intending to be engaged in, the mobile traffic information business, in direct competition with 3rd Dimension.

26.     Respondents have been offering for sale a traffic cam system nearly identical to 3rd Dimension's Traffic Cam Application, to wireless carriers and traffic related companies.

27.      Specifically, in recent weeks, 3rd Dimension has learned that Respondents have submitted proposals to third parties to build a traffic cam application which is strikingly similar to the proprietary Traffic Cam Application developed and enhanced by Respondents under the Work Order for 3rd Dimension.

28.      In particular, Respondents have submitted a proposal for the development of a traffic camera application to a company called Global Traffic Network, a leading provider of real-time traffic information in Australia and Canada (the "**Global Traffic Network Proposal**"). In the Global Traffic Network Proposal, Respondents claim they will "create a mobile application utilizing a unique graphic selection interface that lets users intuitively and efficiently choose which traffic camera or route they wish to view." Such description mirrors precisely the 3rd Dimension product. A true and correct copy of the Global Traffic Network Proposal is attached hereto as Exhibit C.

29.      In addition, Respondents have recently submitted a proposal to Sprint Nextel ("**Sprint**") related to a traffic cam application, which also appears nearly identical to that of 3rd Dimension (the "**Sprint Proposal**"). A true and correct copy of the Sprint Proposal is attached hereto as Exhibit D.

30.      Respondents' Sprint Proposal has impacted adversely 3rd Dimension's potential business opportunities. On October 10, 2007, I met with a Sprint Product Manager who is responsible for, among other things, procuring traffic-related applications for Sprint's network. I introduced Sprint to 3rd Dimension's Traffic Cam Application. The Sprint Product Manager told me that while he was impressed by 3rd Dimension's Traffic Cam Application, Sprint may not be interested in it because it was highly similar to an application Sprint is planning to launch from Skyward Mobile.

31.     Respondents also have submitted a proposal to Traffic.com, which offers a traffic cam application nearly identical to that of 3rd Dimension (the "**Traffic.com Proposal**"). Traffic.com is a Web and interactive service that provides traffic information and content to consumers, and is owned by NAVTEQ Corp., a Chicago-based mapping company.

32.     On October 1, 2007, *Mass High Tech: The Journal of New England Technology* reported that Respondents have "built 50 applications during the past four months for content partners such as Navteq Corp." In addition, Respondents' website indicates that they will be exhibiting in NAVTEQ's booth at an upcoming trade show. A true and correct copy of the article from this publication is attached hereto as Exhibit E.

33.     3rd Dimension recently came into possession of a demonstration program that Respondents have been using to sell their infringing traffic cam service (the "**Demonstration**"). The Demonstration not only emulates 3rd Dimension's proprietary application, but uses the actual proprietary feeds from 3rd Dimension's own operating service, purporting them as their own. Among other things, the Demonstration employs capabilities that are strikingly similar to the proprietary Traffic Cam Application developed by Respondents for 3rd Dimension pursuant to the Work Order. A true and correct copy of the Demonstration is attached hereto as Exhibit F.

34.     It took several years and significant investment of resources for 3rd Dimension to develop and design its proprietary Traffic Cam Application. Respondents were able to quickly market a similar platform, because of their brazen use and misappropriation of 3rd Dimension's proprietary technology and intellectual property.

35.     Based on Respondents' conduct, 3rd Dimension's proprietary technology and intellectual property are at great risk of being widely spread and used imminently without 3rd Dimension's consent.

## THE POTENTIAL IMPACT

36.    If Respondents are permitted to continue to abuse and misappropriate 3rd Dimension's proprietary technology and other intellectual property, 3rd Dimension's proprietary lead in its industry will be compromised, causing an incredibly devastating and immeasurable effect on 3rd Dimension's business, including lost sales, lost profits and business opportunities, loss of goodwill and damages to its reputation.

37.    3rd Dimension respectfully requests that the Court issue an injunction preventing Respondents' further abuse and disclosure of 3rd Dimension's valuable proprietary technology and other intellectual property and trade secrets in violation of the Work Order and Confidentiality Agreement.

Bruce Laskin

Sworn to before me this
_15_ day of October, 2007

Notary Public

NANCY VILLACIS
NOTARY PUBLIC
KINGS COUNTY, NEW YORK
NO #01VI6102596
EXPIRES 12/08/07

New York
New York

# Exhibit A

# WORK ORDER

This Work Order sets forth certain Services (as hereinafter defined) to be performed by Skyward Mobile, LLC ("DEVELOPER") in accordance with the terms and conditions herein between 3rd Dimension, Inc., its subsidiary SkyMobileNet, Inc., its subsidiaries and affiliates ("SMN") and DEVELOPER.

1.    **Services**:

Subject to the satisfaction of SMN's obligations hereunder, DEVELOPER shall provide the following services to SMN (the "Services").

Upon execution of this Work Order, DEVELOPER shall develop and enhance SMN's Mobile Traffic application to meet requirements mutually agreed to by SMN and DEVELOPER, attached hereto as Exhibit B, Demo and Project 1A. If any term or statement of this Agreement conflicts with a term or statement in Exhibit B, this Agreement will be deemed to prevail.

DEVELOPER will provide all necessary technical support, training and related documentation to SMN to provide for SMN's use of the Software ("Support") for the duration of the development and for 12 months thereafter.

DEVELOPER shall install a single instance of demonstration, test and production software, at SMNs' request.

In addition, Developer agrees to provide the following services, provided, however, that the DEVELOPER shall not be required to perform the services listed in sections 13a and 15a (as indicated by *), unless and until the DEVELOPER and SMN have mutually agreed upon the scope of such services and the compensation to be paid to the DEVELOPER:

1) Work as specified in Exhibit B, Demo and Project 1A
2) Detailed statement of work
3) Detailed manpower estimates
4) Detailed timeline/milestones
5) Scheduled 2x/week status meeting/internal demonstration
6) Detailed hardware and 3rd party software requirements
7) SQA process description
8) All operational software installed and running on our servers
9) Application installation and operation documentation
10) All source code
11) Server configuration documentation/notes
12) Rights/ownership of all source, IP, look-and-feel, etc.
13) Agreement to debug/maintain (no improvements) the Software for 12 months
*13a) Agreement to re-skin the Software.
14) Confidentiality, Non-Circumvention and Non-Disclosure Agreement (Exhibit A)
15) Agreement to assign any patent filings
*15a) Agreement to assist in authoring any patent filings
16) Analysis document specifying number of simultaneous users supported per server and how the application scales across multiple servers for additional capacity and redundancy.
17) Initial deployment on redundant array of production servers plus separate development/test server (non-redundant).

{17197\77106\A0111412.1}

**2.    Location:**
Any customization of any SMN application software and procedures shall be performed at DEVELOPER's location. It is expected that technical support and training shall be provided primarily via written documentation and phone support as specified herein. If on-site support is required, SMN will cover related transportation and lodging costs for DEVELOPER personnel.

**3.    Commencement Date:**
The Services shall commence upon the effective date of the Agreement as set forth below and DEVELOPER'S receipt of the inception payment set forth below ("Effective Date").

**4.    Term:**
This Work Order expires upon the completion of the provision of the Services .

**5.    Compensation.**
Payment by SMN to DEVELOPER for the Services shall be as follows:
(supersedes payment terms in Exhibit B)

Demo: (total: $50,000)
      Inception (50%): $25,000 - Already Paid
      Demonstration at CTIA 2006 (20%): $10,000 - Already Paid
      Development Completion (10%): $5,000 - Already Paid
      Final Payment (20%): $10,000 – Upon Execution of this Agreement and related exhibits

Project 1A: (total: $148,250)
      Inception: $15,000 – Upon Execution of this Agreement and related exhibits
      Specification: $22,500 – Upon Execution of this Agreement and related exhibits
          Internal Demonstration: $27,500 – Upon Execution of this Agreement and related exhibits
          (note: It is understood by all parties to this agreement that this is a prepayment for a work element not yet performed as an accommodation to DEVELOPER. It is expected that such work element will be completed and presented in a timely manner.)
      Development Completion: $37,500 - When final versions of all software are made available and ready for deployment
      Commercial Readiness: $34,750 - When all WORK ORDER-related systems are online and ready for customer access
      Successful Public Beta Release: $11,000 - When 100 users have been successfully activated on the deployed system, or 30 days following Commercial Readiness, whichever comes first.

SMN shall reimburse DEVELOPER for all reasonable and necessary expenses, approved in advance, in writing, incurred or paid by DEVELOPER in connection with, or related to, the performance of its Services under this Work Order (the "Expenses") within thirty (30) days after receipt thereof.

**6.    Termination:**

(a)    This Work Order may be terminated at anytime as the result of a mutual agreement between DEVELOPER and SMN.

(b)    This Work Order may be terminated by either SMN or DEVELOPER upon a breach by the other party, following a 30 day cure period (from the date of written notice specifying in detail the nature of the breach).

In the event of any such termination, DEVELOPER shall be entitled to payment by SMN for: (a) that portion of the Services earned by DEVELOPER as a result of the Services performed by DEVELOPER up to the effective date of termination, and (b) the expenses incurred by DEVELOPER prior to the effective date of termination, and shall be entitled to terminate all ongoing services.

7.    **Independent Contractor Status:**
Nothing herein contained shall be construed so as to constitute SMN and DEVELOPER as joint venturers, partners or affiliates, or as to make either party liable for the obligations or debts of the other. DEVELOPER is and shall be deemed for all purposes an independent contractor, and not an employee, servant or agent of SMN. Neither party shall have any authority to bind the other party by any act, omission, representation, agreement or otherwise.

8.    **Intellectual Property:**
All inventions, systems, processes, designs, innovations and improvements (including any source code) directly related to the Services provided by DEVELOPER (collectively, the "IP"), which are made, conceived, reduced to practice, created, written, designed or developed by DEVELOPER, solely in connection with the performance of the Services shall be the sole property of SMN; provided, however, DEVELOPER shall have an irrevocable, non-transferable license for the use of the IP relating to the product created by this Work Order in non-competing businesses with respect to SMN, as pre-approved in writing by SMN. Notwithstanding the foregoing, the source code shall not be delivered to the SMN until and unless DEVELOPER has received the compensation for its Services, in full.

9.    **Non-solicitation:**
SMN and DEVELOPER hereto acknowledge that the training and qualifications of the employees and consultants of SMN and DEVELOPER are unique and that the loss of these employees and/or consultants may affect SMN's and DEVELOPER's competitiveness and continued commercial success. It is expressly agreed and understood therefore that during the term of this Agreement and for a period of one (1) year following the termination thereof, SMN and DEVELOPER will not, directly or indirectly, by themselves or as a partner or in any relationship with any other person or entity, recruit from each other, or hire, any of each other's employees or consultants or induce, solicit, or influence any employee or consultant of SMN or DEVELOPER to terminate or curtail his or her employment or engagement with SMN or DEVELOPER, without the current employer's prior written consent.  The covenants and obligations of SMN and DEVELOPER set forth in this Paragraph shall be specifically enforceable in addition to and not in limitation of any other legal or equitable remedies, including monetary damages, which SMN and DEVELOPER may have.

10.    **Disputes:**
Any dispute, controversy or claim arising out of, in connection with, or in relation to this Work Order or the breach of any of the provisions hereof shall be settled by binding arbitration in New York City, NY pursuant to the rules then obtaining of the American Arbitration Association. Any award shall be final, binding and conclusive upon the parties and a judgment rendered thereon may be entered in any court having competent jurisdiction thereof. The prevailing party shall be entitled to recover all reasonable fees and expenses of the costs of such arbitration (including reasonable attorneys' fees), and if no party shall be determined by the arbitrator(s) to have successfully prevailed, or to be less at fault then the other party, then each party shall

{17197\77106\A0111412.1}                        3

bear its own costs and expenses (including attorneys' fees). The parties shall use their best efforts to settle any and all disputes without resort to arbitration and litigation.

11.    **Notices:**

All notices required or permitted under this Work Order shall be in writing and shall be deemed effective upon personal delivery or upon deposit in the United States Post Office, by registered or certified mail, postage prepaid, addressed to the other party at the address shown above, or at such other address or addresses as either party shall designate to the other in accordance with this provision.

12.    **Limitation of Liability; Indemnification.**

(a)    DEVELOPER's liability hereunder for damages, regardless of the form of action, shall not exceed the total amount paid to DEVELOPER for its Services pursuant to this Agreement. This shall be SMN's sole and exclusive remedy, both at law and in equity. IN NO EVENT SHALL DEVELOPER BE LIABLE FOR ANY LOST PROFITS, LOST REVENUE, LOSS OF USE, LOSS OF DATA, ALTERATION OF DATA, DELAY IN DELIVERY, PERFORMANCE OF SERVICES OR FOR ANY SPECIAL, INDIRECT, OR CONSEQUENTIAL DAMAGES, ARISING OUT OF THIS AGREEMENT, OR THE PERFORMANCE OR BREACH THEREOF, EVEN IF DEVELOPER HAS BEEN ADVISED OF THE POTENTIAL FOR SUCH DAMAGES.

(b)    SMN and DEVELOPER each hereby agree to indemnify and hold harmless the other party and the other party's officers, directors, shareholders, employees, servants and agents from and against any and all claims, liabilities and expenses of any nature whatsoever, with respect to any claims of any nature (i) arising from or caused in whole or in part by any negligent act or omission, negligent performance of services or willful misconduct of SMN or DEVELOPER or either party's employees, agents and contractors; (ii) arising from or in connection with any warranty, representation or statement made by SMN or DEVELOPER or either party's employees, agents, and contractors or (iii) arising from or in connection with the breach of any obligation of, or warranty by, SMN or DEVELOPER as set forth in this Agreement. In respect of any of the foregoing, SMN and DEVELOPER shall indemnify all of the foregoing indemnities from and against any and all costs, expenses (including reasonable attorney's fees) and liabilities incurred in connection with any claim, action or proceeding brought thereon. All indemnity obligations under this Agreement shall apply to claims arising both before and after the termination of this Agreement.

(c)    The provisions of this Section shall be in full force and effect forever and shall survive the termination of the Agreement, regardless of the manner of or reason for termination.

(d)    **TO THE EXTENT ALLOWED BY LAW, DEVELOPER HEREBY DISCLAIMS ALL WARRANTIES, BOTH EXPRESS AND IMPLIED, INCLUDING IMPLIED WARRANTIES RESPECTING MERCHANTABILITY, TITLE, AND FITNESS FOR A PARTICULAR PURPOSE. SMN ACKNOWLEDGES THAT NO REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS AGREEMENT HAVE BEEN MADE RESPECTING THE SERVICES TO BE PROVIDED HEREUNDER, AND THAT SMN HAS NOT RELIED ON ANY REPRESENTATION NOT EXPRESSLY SET OUT IN THIS AGREEMENT.**

13.    **Miscellaneous:**

(i) This Agreement shall be binding upon and inure to the benefit of the respective parties and their successors, assigns, heirs, and personal representatives; (ii) this Agreement shall be governed by and construed in accordance with the laws of the State of New York; (iii) no waiver of any right hereunder by any party shall operate as a waiver of any other right, or of the same right with respect to any subsequent

{I7197/7106\A0111412.1}                        4

occasion for its exercise, or of any right to damages, and no waiver by any party of any breach of this Agreement shall be held to constitute a waiver of any other breach or a continuation of the same breach; (iv) all remedies provided by this Agreement shall be in addition to all other remedies provided by law; (v) this Agreement may not be amended except in a writing signed by the parties hereto; and (vi) in no event shall DEVELOPER or SMN be liable for any delay or failure to perform any obligation or its services described hereunder due to causes beyond its control and without its fault or negligence.

{1719717710AA0111412.1}

5

10/14/2007  08:09  15037721578                    P.A. GRILLO ASSOC          PAGE  10
Sent By: Matrix General LLC  (NY-USA);  7752550801;        May-1-06 12:01PM;      Page 6/9

**Skyward Mobile, LLC**

Signature

Jeremy deBond
Printed or Typed Name

CEO
Title

5/1/06
Date

**SkyMobilnet, Inc.**

Signature

P. Grillo
Printed or Typed Name

CEO
Title

5-1-06
Date

**3rd Dimension, Inc.**

Signature

P. Grillo
Printed or Typed Name

CEO
Title

5-1-06
Date

[17197\77106\A0111412.1]

6

# Exhibit B

## EXHIBIT A

### CONFIDENTIALITY, NON-CIRCUMVENTION
### AND NON-DISCLOSURE AGREEMENT

THIS AGREEMENT, made and entered into by and between the following parties
whose signatures and seals appear below: 3rd Dimension, Inc., a Nevada
Corporation, 201 W 52nd St, New York, NY 10019, USA, and its subsidiary
SkyMobileNet, Inc. hereinafter referred to as the "COMPANY", and Skyward
Mobile, LLC hereinafter referred to as the "RECEIVER", by and for the
consideration of the mutual covenants, promises, benefits, and terms of this
contract, and for other good and valuable consideration, the receipt and
sufficiency of which is hereby acknowledged, do hereby covenant and agree as
follows, to wit:

WHEREAS, the parties to this Agreement, wish to share and disclose Confidential
Information (as defined below) in the course of exploratory conferences,
negotiations, development and deployment activities; and

WHEREAS, the parties to this Agreement mutually desire that these conferences,
negotiations, development and deployment activities be as frank and open as
possible;

THEREFORE, the procedures described in this Agreement are considered necessary
and appropriate to achieve this purpose, and the parties hereby mutually
confirm their respective understanding and agreement as follows:

1. For the purpose of this Agreement, "Confidential Information" shall mean
information or material proprietary to any of the parties or designated in
writing as Confidential Information by any party to this Agreement or to which
any party to this Agreement may obtain knowledge or access through or as result
of discussions or relationships of any of the parties to this Agreement.

2. Confidential Information includes, but is not limited to, the following
types of information and other information of a similar nature (whether or not
reduced to writing): financial or credit data documentation, prospects,
appraisals, customer/client names or their agents or representatives, contracts
or negotiations, financial sources and/or financial information, all
copyrighted material, all trademarks or service marks, whether patented or not,
and all technical and scientific information, test results and data as it
relates to the Company and proprietary technology which the Company shall
disclose to Receiver whether patented or not, including all trade secrets, any
and all patents and patents pending including but not limited to, current
information used in any patent applications and any other information of a
similar nature (whether or not reduced to writing). Confidential Information
also includes any information described above which any party to this Agreement
shall have obtained from another (third) party which any of the parties to this
Agreement, respectively, treat as proprietary or designate as Confidential
Information. Confidential Information does not include any information
which is already known to the Receiver at the time it is disclosed to the
Receiver by the Company or which before being divulged by the Company (a) has
become generally known to the public through no wrongful act of Receiver; (b)
has been approved for release to the general public by written authorization of
the Company; or (c) has been disclosed pursuant to a requirement of a
government agency or law without similar restrictions or other protections
against disclosure or is required to be disclosed by operation of law.

3. The parties to this Agreement mutually agree not to reproduce in any manner
any Confidential Information nor use the Confidential Information to contact or
solicit those individuals or the agents or representatives thereof who may be
included in the Confidential Information in an effort to gain benefit through
circumvention of the other party or parties to this Agreement; further the

parties to this Agreement mutually agree not to do anything that may be construed as disparaging in any way, or utilizing the Confidential Information of another party to this Agreement without first having obtained prior written consent from the party or parties so affected.

4. The parties to this Agreement mutually agree to hold in confidence and not directly or indirectly reveal, report, publish, disclose or transfer any Confidential Information to any person or entity other than a key senior employee or other party or parties who have absolute need to know such Confidential Information consistent with the respective party's obligations under this Agreement. The parties to this Agreement understand and agree that they will not utilize any of the Confidential Information for any purpose at any time other than contemplated by this Agreement.

5. Because of the unique nature of the Confidential Information, each party to this Agreement understands and agrees that the other parties to this Agreement will suffer irreparable economic harm in the event that a party fails to comply with any of its obligations under this Agreement. Accordingly, any dispute involving circumvention, breach of confidentiality or unauthorized disclosure under the terms of this Agreement, each party herein subjects itself voluntary to and shall be governed by the laws of the State of New York. In the event of any legal action by either party under this Agreement, damages to be paid by the losing party shall include all court costs, attorneys fees, travel, lodging and any other charges deemed reasonable by the court. Additionally, the parties to this Agreement understand and agree that in addition to the severe economic harm in the event of failure or breach under the terms of this Agreement, the injured party may suffer irreparable harm that monetary damages will be inadequate to compensate, and that in addition to the above mentioned remedies available at law or in equity, the injured party will be entitled to seek immediate injunctive relief to enforce the terms and conditions of this Agreement.

6. The parties to this Agreement agree that the terms and conditions of this Contract are fully applicable and binding upon themselves, all employees, their affiliates, subsidiaries, representatives, agents associates, assigns, trustees, their heirs and/or assigns, legal representatives or executors, and irrevocably bind themselves not to deal directly or indirectly with any persons, trusts, businesses, corporations or partnerships, or other entities introduced to the parties of this Agreement for purposes of or related to applications developed under contract between the parties without the knowledge and express written consent of the other parties to this Agreement. The parties hereto agree not to circumvent the other parties in any manner for a period of five (5) years from the date of this Agreement or any other contractual agreement between themselves and any party to this Agreement.

7. The parties hereto further bind themselves, their employees, shareholders, officers, directors, associates, partners, agents or representatives to keep absolutely confidential any and all matters pertaining to this Agreement and all related and/or resulting contracts and information provided between the parties hereto.

8. The parties hereto confirm that the warranties in this Agreement are expressly intended to cover acts of negligence and any inadvertent or unintentional disclosure or violation of the terms herein.

9. This Agreement is binding and inures to the benefit of the parties hereto the owner of the patented, patent pending or proprietary technology disclosed by the Company to the Receiver, their principals, affiliates, attorneys, subsidiaries, agents, legal representatives, heirs and/or assigns.

10. This Agreement may not be modified or amended except in writing and signed by all the parties hereto.

11. This Agreement is effective on the date when signed by all parties and is executed in multiple originals, each of which has the force and effect of an original.

12. If any party to this Contract is a corporation, trust, partnership, or association, the individual or individuals signing this Agreement on behalf of said party's behalf expressly warrant:

   (a) That each such person has the full and complete authority, in writing, of the Receiver's Board of Directors, Board of Trustees, General Manager or Managing Partner, Managing Director or Directors to legally and effectively bind that party to this Agreement;

   (b) That said Directors, Trustees, General Manager or Managing Partner, Managing Director or Directors have been fully informed concerning the terms and conditions of this Agreement and acknowledge and understand and have approved the provisions of this Agreement; and

   (c) That the party is, in fact and at law, effectively bound by the provisions of this Agreement. This signatory of or for all parties hereby certifies that he or they are entering into this Agreement of his or her or its own free will, respectively.

NOW, WHEREFORE, this Agreement is executed in multiple original copies by and on behalf of the parties testifying that the foregoing instrument fully sets forth their entire agreement and understanding, whose seals and signatures are affixed with the year and date set forth below.

3rd Dimension, Inc.
Signature
Print Name  P. Grillo

Skyward Mobile, LLC
Signature  Jeremy DiBonet
Print Name  CEO    5/1/06

SkyMobileNet, Inc.
Signature
Print Name  P. Grillo

# Exhibit C



# Proposal for Development of Traffic Camera Application

## For

Skyward Mobile
130 New Boston Street
Suite 103
Woburn, MA 01801
www.skywardmobile.com
Tim Kilroy
(617) 899-2436
tim@skywardmobile.com

## Overview

Global Traffic Network, the leading provider of real time traffic information in Australia and Canada, wishes to create a flexible, dynamic mobile application that will allow subscribers the ability to see real time images from traffic cameras placed strategically at key traffic centers in Australia, Canada and going forward, the UK and EU.

Skyward Mobile will create a mobile application utilizing a unique graphic selection interface that lets users intuitively and efficiently choose which traffic camera or route they wish to view.

## Why Skyward Mobile?

Skyward Mobile is a leading provider of next generation mobile applications. With deep experience creating rich and complex media applications, Skyward Mobile is uniquely qualified to drive the development of a wide market reaching consumer application.

The mobile application development market is a complex and fragmented place. With dozens of carriers, thousands of handsets, and no true device standard or application protocols, the development of a mobile application is truly the recreation of the application again and again and again. Skyward Mobile has changed the development and economics of application development through the creation of the patent pending **Apx Platform**.

This "write-once, run anywhere" platform absolutely changes not only the development dynamics, allowing a single application to perform as well as possible across the widest array of mobile devices possible, but it also changes the economics of development. Typically, the development cycle includes the writing of an application, with extensive QA testing for a subset of phones. Then, the application is rewritten for another subset of phones. This process is repeated again and again. Then, when the platform changes, say from J2ME to Palm, the application needs to not only be re- written, but also rather re-architected for the new platform. Then the individual handset porting process must begin again. And the process continues across multiple platforms. The economic reality of this process is that the work in developing an application for a platform, and then porting it to several phones is approximately the same. Each instance of porting can have nearly the same impact on dollars and time as the

original development.  Efficiencies in development never arise, and the development costs never diminish. These stark realities determine the success of a mobile application.

Simply, if it costs too much in dollars or time to port an application to a new platform, or to a less popular phone, the development will not be done, because there is no opportunity to recoup the cost of the effort or create a positive ROI.  Skyward Mobile changes these dynamics and preserves the "long tail" of application distribution and revenue generation.  This expansion of the market size can create dramatic revenue opportunities.  In a subscription example, a $2.99 monthly subscription opportunity targeted at Palm Treos might have a total market size of 1,000,000. However, if that same subscription opportunity were offered to the entire J2ME base in the United States, the market size might be 50-70 times the
size. While it may seem like a simple task of "porting" the Palm application to J2ME, the J2ME US market is comprised of approximately 500 different handsets across nearly a dozen carriers.  Potentially, this could mean a port cycle upwards of 5000 different versions of the original application. And these applications would be static, never changing according to unique conditions.  This would take tens of thousands of developer hours, and potentially millions in additional development costs.  And regardless of the market size, this opportunity may never be fully capitalized because of the scale and scope of the effort. An undertaking of this magnitude could force a company to allocate all of its development at this single project and compromise product innovation efforts. The Skyward Mobile Apx solution allows for single development, with multiple marketplace opportunities that have been heretofore lost because the cost of development exceeded the possible return for a particular marketplace.  Apx gives brand owners, content owners and application owners the chance to create high-quality applications that can grow as the market changes, and continue to delight users across networks, across platforms and across continents.


## Definitions

**Volume Apx License:** Typically, the Apx platform is licensed in a one license/one application way. However, some partners may wish to create many

applications. In order to provide the most cost effective customer solution, Skyward Mobile can offer volume licensing to select partners. This volume license carries with it the opportunity to have multiple applications developed on the Apx platform for a reduced licensing fee. The development of a new application triggers a licensing event. Each license event covered by the volume license is good for 12 months from the final delivery of the specific application from Skyward to the customer.

**Application Development Fee:** This fee is the fee paid by the Global Traffic Network to Skyward Mobile for the design, programming, and production of an application.

**Regional Application Development Fee:** This is a fee paid by the Global Traffic Network to Skyward Mobile for the re-skinning of the basic application covered by the **Application Development Fee** to make subsequent versions appropriate to the region in which they will be deployed. For instance, if Global Traffic Network were to create a camera network that covered London, this fee would cover the creation of a London specific application. These subsequent applications will be developed within 60 days of request. If this timeline request predates the integration of Phase 2 functionality, that functionality will be added when added to the initial launch applications.

**Traffic Camera Integration Fee:** This is a monthly fee paid by the Global Traffic Network to Skyward to insure the ongoing inclusion of that camera to the appropriate application.

**Hosting and Operations Fee:** This is a monthly fee paid by Global Traffic Network to Skyward Mobile for the 24/7/365 monitoring and hosting of the applications developed and deployed. This fee is based on the number of applications distributed. This fee also covers 24/7/365 support for Global Traffic Network, and 24/7/365 application support for GTN customers.

**Distribution Fee:** This is a per-event fee paid by Global Traffic Network to Skyward Mobile for the distribution of the developed applications

**Map Image Licensing Fee:** This is a pass through cost from Skyward Mobile to Global Traffic Network for the monies needed to secure appropriate map images for inclusion in the application for user navigation.

## The Proposal

Skyward Mobile will create a multi-platform application that exhibits similar functionality to the images below. Essentially, for a given area, the end user will be able to pick successively more focused areas, eventually resulting in a particular traffic camera. The figures below represent the essential functionality.